In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-1664 & 01-1665

Charles Roche, Jr.,

Petitioner-Appellee,
Cross-Appellant,

v.

Cecil Davis, Warden, Indiana State Prison,

Respondent-Appellant,
Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 98 C 347--Allen Sharp, Judge.

Argued January 29, 2002--Decided May 28, 2002

Before Coffey, Kanne, and Rovner, Circuit
Judges.

Kanne, Circuit Judge.  A Lake County,
Indiana jury found petitioner Charles
Roche, Jr. guilty of murder, and the
trial judge sentenced him to death. After
exhausting his state court remedies,
Roche filed a petition for writ of habeas
corpus pursuant to 28 U.S.C. sec. 2254.
The district court granted the habeas
petition and ordered Roche to be
sentenced to life without parole. We
affirm the grant of habeas corpus, but
vacate the disposition and remand to the
district court to return the case to
state court for re-sentencing.

I.  History

A.  Background

  On May 11, 1990, the bodies of Ernest
"Pee Wee" Graves and Daniel Brown were
found near Gary, Indiana. The police soon
determined that the two men had been
victims of a homicide. On May 16, 1990,
an information was filed against Roche in
the Lake County Superior Court, charging
him with two counts of murder and two
counts of felony murder pursuant to Ind.
Code sec. 35-42-1-1/1 and seeking the
death penalty. Edward Niksich and Roche's

father, Charles Roche, Sr., were both joined as defendants, although the State did not seek the death penalty against Roche, Sr. On May 21, 1990, Noah Holcomb was appointed as Roche's counsel. Thereafter, both Niksich and Roche, Sr. moved for severance. The court granted Roche, Sr.'s motion, but denied Niksich's, thereby leaving Niksich and Roche to be tried jointly. Additionally, Niksich moved to suppress the fruits of the search of his home, which the court granted. Niksich also filed a motion in limine, seeking to exclude evidence concerning a robbery in which Niksich had previously been involved. Roche's counsel did not attend any of the severance hearings or the hearings on Niksich's motion to suppress or motion in limine.

B.  The Trial

During most of the joint trial of Roche and Niksich, Roche wore shackles on his legs while he sat at counsel's table and when he took the stand to testify. The following evidence was adduced against Roche at trial: In early 1990, Niksich told his girlfriend, Patricia Andrasco, that Graves had stolen $120 worth of food stamps from Andrasco's car. Several weeks later, the woman who babysat Andrasco's children overheard a conversation between Roche and Niksich, and one of the men stated that Graves and Brown needed to be killed.

On May 10, 1990, Roche and Niksich went to the Spot Bar in Calumet City, Illinois and induced Graves and Brown to come to Roche's house by concocting a phony drug deal. Once there, Roche and Niksich took Graves and Brown into the basement of the house. Roche then went upstairs into his bedroom and told his girlfriend Delores Duszynski "to stay put" because "he had some guys downstairs that he was going to shoot because [they] owed somebody $120." Duszynski testified that several minutes later, she heard about nine or ten gunshots coming from the basement. She then heard someone pleading for his life, begging "please don't kill me, please don't kill me, just take my money, but please don't kill me." Duszynski then heard several more gunshots, and a few minutes later, Roche, Niksich, and Roche, Sr. came into the bedroom. Roche told her that all the two men had on them was $19 and a dime bag of cocaine. Roche then cut

up some lines of cocaine on the dresser in the bedroom, and she, Roche, and Niksich each snorted a line. Roche, Niksich, and Roche, Sr. then loaded the two bodies into the trunk of Duszynski's car and drove off.

The three men then saw Jose Sanchez walking down the street and offered to give him a ride home. Sanchez testified that when he got into the car he saw blood on Roche, Sr.'s shirt. When the group arrived at Sanchez's house, they got out of the car and Roche opened the trunk, inside of which Sanchez saw two bloody bodies. The group then went inside of Sanchez's house, and Roche, Sr. immediately went into the bathroom and came out wearing a different shirt than he was wearing before. Next, the group gathered in Sanchez's living room, and Niksich exclaimed that he had shot one of the victims in the head in the basement of Roche's house and had taken his wallet. Roche then exclaimed that he had shot the other victim once in the chest, once in the stomach, and once in the head. Roche said that the victim was still alive and had begged for his life, but that Roche went upstairs, got a rifle, and went back into the basement and "kept on shooting him in the head." Sanchez testified that Roche told him that he used a .38 caliber gun and a .22 caliber rifle to kill one of the victims.

On May 11, 1990, there was an article in a local newspaper concerning Graves' and Brown's deaths./2 The article stated that two dead bodies had been found at the intersection of 9th Avenue and Cline Avenue near Gary in the early morning hours of May 11. The article also claimed that the police believed that the two dead men were victims of homicides and that there were no suspects at that time. Roche cut the article out of the newspaper and Duszynski put the article into a folder to save as a keepsake. Furthermore, Roche boasted about his involvement in Graves' and Brown's deaths on several occasions. For example, on May 12, 1990, he told his neighbor Larry Milligan, "I shot one and Eddie [Niksich] shot one." Also, at a party that Roche hosted on May 13, he told another neighbor, James Superits, that he and Niksich had shot two men in Roche's basement a few days earlier. He showed Superits the newspaper article and

brought him down to the basement to show him where he and Niksich had shot Graves and Brown. In addition, Roche sold Superits a .38 caliber Derringer handgun, which Superits later gave to the police, and which the State entered into evidence.

On May 13, Sanchez went to the Hammond police station and informed them of his knowledge regarding the deaths of Brown and Graves, pointing the finger at Roche, Niksich, and Roche, Sr. Niksich, Roche, Sr., Duszynski, and Milligan were arrested several days later, although Roche remained at large. On May 16, Roche turned himself in to Russ Ewing, a Chicago television reporter, and Ewing's crew filmed Roche admitting that he shot two men in his basement. Ewing then took Roche to the Gary Police Department, where Roche gave a statement to the police, claiming that he "unloaded seventeen shots with a .22 rifle into the bodies of the two men." Roche confessed to his involvement in Graves' and Brown's deaths a fifth time on July 10, 1990, while being detained at the Lake County Jail. He told corrections officer Virginia Ratajczak that on May 10, he brought Graves and Brown into the basement of his house, that they had pleaded for their lives, and that he had shot them both to death. The State entered into evidence a redacted series of notes that Roche and another detainee passed back and forth while both were detained at the Lake County Jail. The redacted notes stated as follows:

Detainee: Roche, how do you deal with it, man, now that the prosecutor has filed the death request on you, don't it even bother you?

Roche: That shit don't move me. That's their way of trying to bluff someone into a cop-out, but I know they ain't got the balls to go through with it. They're faking at it, dude. They [have to prove] I did it in cold blood, plus they can't prove I took their money.

Detainee: Man, you just don't seem like the type to kill people for no reason or just in cold blood. From what I know of you, you just don't seem that kind.

Roche: Well, that's the whole idea behind my innocent smile. As long as a person

doesn't think one is capable of it or don't look like the type, they can lure a person anywhere and smile them to their grave. Ha, my regret is turning myself in. I should of shot it out with the pigs and killed some of them. Plus, I should have killed my old lady that night and the Mexican. It's too late for the should of's and could of's. I've just got to beat this shit now.

Further, the State entered evidence concerning the investigation of Graves' and Brown's deaths. Security guard Randall Bowman testified that in the early-morning hours of May 11, he saw two bodies lying in the roadway at the intersection of 9th Avenue and the Cline Avenue service road. He stated that he returned to his office and called the police. Lake County Sheriff's Department evidence technician Ronald Lach testified that he arrived at the scene at approximately 12:30 a.m. on May 11. He photographed the bodies, collected a cigarette butt at the scene, and noted the absence of any identification on the bodies. Finally, he transported the bodies to the Guy and Allen Funeral Home, where the autopsies were conducted.

Dr. Young Kim, a pathologist for the Lake County Coroner's Office, performed the autopsies on Graves and Brown. Dr. Kim testified that he found six gunshot wounds on Brown's body--one on the left side of his chest, one on the left side of his head, and four on the right side of his face. Dr. Kim testified that Brown had died as a result of extensive fracturing of his skull and laceration of his brain due to gunshot wounds. He testified that he observed seven gunshot wounds on Graves' body--one on the upper right side of his chest, one on the right side of his chest, one of the left side of his back, one on the left side of his head, one on the right side of his face, one behind his ear, and one on the left side of his face. Dr. Kim stated that he determined that Graves had died as a result of gunshot wounds that caused a perforal injury of his right lung and a perforation of his brain. Finally, Dr. Kim testified that he recovered three bullets from Brown's body and five bullets from Graves' body.

Firearms expert Jay Gauthier testified that of the three bullets recovered from Brown's body, two were .38 caliber

bullets fired from the gun that Roche had sold to Superits, and the other was a .22 caliber bullet. He also testified that of the five bullets recovered from Graves' body, four were .38 caliber bullets fired from the gun that Roche had sold to Superits and one was a .25 caliber bullet.

After the State entered the evidence detailed above, Roche took the stand in his own defense and testified to the following: On May 10, 1990, Niksich asked him to obtain some cocaine, and in response, he called Sanchez to arrange to purchase some. Sanchez told him that he would deliver the cocaine to him by 10:30 p.m. that evening. In turn, Roche told Niksich to arrange for the buyers to be in the basement of Roche's house by 11:00 p.m. Roche and his father then went to a local bar, where Roche became intoxicated. Roche and his father met Niksich at Roche's house around 10:30 p.m. Roche, Sr. and Niksich then left the house to go purchase some beer, and while they were gone, Roche heard some noises in the basement. He retrieved his .38 caliber Derringer and his .25 caliber automatic handgun and went down to the basement to investigate. Once in the basement, Roche found two men standing in the utility room. One of the men pointed a gun at him and told Roche to give him the cocaine. The second individual told the gunman to shoot Roche. Roche told the two men that he would go and get the cocaine, but instead he pulled his own gun and fired at the gunman, shooting him in the chest. He then shot the other man in the face. The gunman then pointed his gun at Roche again, so Roche shot him several times with his .25 automatic handgun. Shortly thereafter, Niksich, Roche, Sr., and Sanchez entered the basement and agreed to assist Roche in disposing of the bodies.

C.  Penalty Phase

The jury found Roche and Niksich each guilty of two counts of murder and of two counts of "Murder in the Perpetration of a Robbery." A sentencing hearing was then held for both defendants, during which the State sought the death penalty against both Roche and Niksich. The Indiana Code provided that the State could seek the death penalty against

Roche if it proved at least one of the following aggravating circumstances beyond a reasonable doubt: "[t]he defendant committed the murder[s] by intentionally killing the victim[s] while committing or attempting to commit . . . robbery [or] [t]he defendant has been convicted of another murder." Ind. Code sec.sec. 35-50-2-9(b)(1)(G) & (b)(7) (1990). Further, the Indiana death penalty statute also provided that Roche could present evidence pertaining to any potential mitigating circumstances. See id. at sec. 35-50-2-9(c). The statute provided that the jury could recommend the death penalty, see id. at sec. 35-50-2-9(e), only after it had found that: 1) the state had proved beyond a reasonable doubt that at least one of the aggravating circumstances existed and 2) any mitigating circumstances that existed were outweighed by the aggravating circumstance(s). See id. at sec. 35-50-2-9(k). The court instructed the jury accordingly. The judge would then make the final determination about the appropriate sentence after considering the jury's recommendation and the standards elucidated in Ind. Code sec. 35-50-2-9(k). See id. at sec. 35-50-2-9(e).

With regard to Roche's sentencing hearing, the State entered the Pre-Sentence Report ("PSR") into evidence, which indicated the following: Roche had attained a ninth- grade education and had pled guilty to burglary in 1982 and was incarcerated for about six years as a result. Roche had one child, Crystall Lynn McDaniel, who was five and a half months old, and Roche helped support his daughter financially. Roche's parents divorced when he was very young and he lived with his paternal grandparents from age three to age seven, while his father was incarcerated. After his father was released from prison, Roche lived with Roche, Sr. and his stepmother, who moved around a lot. As a result, Roche frequently changed schools. Further, Roche did not sleep much as a child because his father would "take him places to rip off for money." Roche spent a considerable amount of his childhood in foster homes and with other relatives because his father was in and out of prison. Further, Roche had received psychiatric treatment when he was twelve years old. Finally, the PSR stated that Roche had said that he had never been

addicted to any illegal drugs and that he used marijuana and alcohol daily and snorted cocaine occasionally.

Roche's mother testified that when Roche, Sr. went to prison (and Roche was about three years old), she accepted an offer from Roche's paternal grandparents to allow Roche to live with them. In exchange, the grandparents agreed to pay for her divorce from Roche, Sr. She testified that although she has had very little contact with Roche in the last twenty years, she promised that in the future, she would be much more involved in his life. Roche's sister testified that Roche had told her that he was "very sorry for what had happened [with Graves and Brown]."

After eight hours of deliberation, the jury indicated to the court that it had reached a recommendation with respect to one of the defendants, but that it had not with respect to the other. Each juror stated to the court that further deliberations would not result in the jury being able to reach a recommendation with respect to the second defendant. The jury then told the court that it recommended that the death penalty not be imposed on Niksich, but that it was unable to reach a recommendation with respect to Roche. The court, with counsel's approval, then discharged the jury. Thereafter, the court sentenced Niksich to 80 years imprisonment and sentenced Roche to death. In sentencing Roche to death, the court found that "[a]lthough there were three (3) defendants involved in these killings, the evidence showed that [Roche] was by far the most culpable and is deserving of the death penalty."

D.  Procedural History

After the Indiana Supreme Court affirmed Roche's conviction and sentence on direct appeal, Roche filed a petition for post-conviction relief in the Lake Superior Court. At the post-conviction hearing held on October 30, 1995, Roche presented testimony regarding his shackling during the trial and at the sentencing hearing. Walter Murray, one of the bailiffs during Roche's trial, testified that at some point after the trial had started, he placed leg cuffs on Roche, but not on Niksich. Murray testified that he did not

recall placing a drape over Roche's legs to prevent the jury from seeing the leg cuffs. He further testified that "with the judge's permission we left the leg irons on during the trial because we thought [Roche] was an escape risk." Paula Niksich, Edward Niksich's mother, testified that she could see Roche's shackles during trial and that she did not see a drape that covered the shackles. Finally, a trial witness, Patricia Andrasco, testified that she could see Roche's shackles from the witness box when she testified.

Ultimately, the trial court denied Roche's petition for post-conviction relief. Roche's counsel appealed the denial of the petition to the Indiana Supreme Court, which affirmed. See Roche v. State, 690 N.E.2d 1115 (1997). Subsequently, Roche filed a petition for writ of habeas corpus in federal district court, and the district court found that Roche's shackling claim warranted habeas relief. See Roche v. Anderson, 132 F. Supp.2d 688, 709 (N.D. Ind. 2001). However, it held that "[r]ather than require that Roche be retried, when it is clear from his subsequent conduct that Roche is in fact an escape risk and would most likely be retried in shackles, albeit with an explanation on the record, this court will order Roche sentenced to life without parole." Id. (citation omitted).

On appeal, the state of Indiana argues that the district court improperly granted relief on Roche's shackling claim. On the other hand, Roche cross-appeals, arguing among other things that we should grant him a new trial because his counsel was ineffective for permitting him to be tried before the jury in shackles. Additionally, Roche claims that in granting habeas relief, the district court erred in re-sentencing him to life without parole.

II.  Standard of Review

Roche filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996) (codified at 28 U.S.C. sec. 2254). Therefore, the provisions of AEDPA govern our review. See, e.g., Lindh v. Murphey, 521 U.S. 320, 336, 117 S. Ct.

2059, 138 L. Ed. 2d 481 (1997). AEDPA provides that if a constitutional claim was adjudicated on the merits by the state courts, a federal court may only grant habeas relief based on that claim if the state court's decision was "contrary to" or an "unreasonable application of" federal law as determined by the Supreme Court of the United States./3 28 U.S.C. sec. 2254(d).

In Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), the Supreme Court stated that a state court's decision is "contrary to" established Supreme Court precedent when 1) the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or 2) the state court confronts a set of facts that is materially indistinguishable from those of a decision of the Supreme Court and nevertheless arrives at a decision different from that reached by the Supreme Court precedent. In the present case, the Indiana Supreme Court correctly applied Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) as the controlling precedent for Roche's ineffective assistance of counsel claims, see Roche, 690 N.E.2d at 1120, and "Strickland undoubtedly qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States,' within the meaning of [AEDPA]." Williams, 529 U.S. at 413. Further, the Supreme Court has never addressed facts that are materially indistinguishable from those in this case. Therefore, because the Indiana Supreme Court's decision was not "contrary to" established federal law, Roche is not entitled to habeas relief on this ground.

Nevertheless, we must determine whether the Indiana Supreme Court's conclusions with respect to Roche's ineffective assistance of counsel claims resulted from "an unreasonable application of" Strickland. See Williams, 529 U.S. at 411. In doing so, we must keep in mind that we may not issue a writ of habeas corpus "simply because [we] conclude[ ] . . . that the relevant state-court decision applied [Strickland] erroneously or incorrectly. Rather, that application must also be unreasonable." Id. A defendant who claims that his counsel's assistance was so defective as to warrant

a reversal must establish two components: 1) that his counsel's performance fell below an objective standard of reasonableness and 2) that he was prejudiced by the deficient performance. See Strickland, 466 U.S. at 687-88. A failure to establish either prong results in a denial of the ineffective assistance of counsel claim. See Hough v. Anderson, 272 F.3d 878, 890 (7th Cir. 2001). Prejudice occurs when there is a "reasonable probability" that but for counsel's deficient performance, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

III.  Analysis

A.  Procedural Default

As an initial matter, the state contends that Roche has procedurally defaulted his claim that trial counsel was ineffective with respect to his shackling during trial because this claim was not raised on direct appeal. However, the Indiana Supreme Court adjudicated Roche's shackling claim on the merits, noting that Roche's appellate counsel was the same person that represented him at trial. See Roche, 690 N.E.2d at 1122-23. Thus, we are not barred from reaching the merits of this claim because "[i]f the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

B.  Shackling

With regard to the merits, Roche argues that he should receive a new trial because his counsel was ineffective for not objecting to him being shackled during trial and then for not taking precautions to ensure that the jury could not see the shackles. In addition, the state appeals the district court's decision that Roche's shackling prejudiced him during his initial sentencing hearing.

The jurisprudence regarding the effects

of shackling merits a brief discussion. In Illinois v. Allen, 397 U.S. 337, 343-44, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970), the Supreme Court first addressed the issue of shackling and held that "there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . : (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly." In addition, the Supreme Court explained that "no person should be tried while shackled and gagged except as a last resort." Id. at 344. Building on Allen, the Supreme Court in Holbrook v. Flynn, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986), considered the issue of "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." The Court held that it was not, but set forth the standard for analyzing inherently prejudicial practices such as shackling. See id. at 569-70. The Court stated that "[w]henever a courtroom arrangement is challenged as inherently prejudicial . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." Id. at 570 (quotation omitted). Consistent with Allen and Holbrook, this court has held that "[a]s a general rule, a defendant in a criminal case has the right to appear before the jury free from shackles or other physical restraints." Harrell v. Israel, 672 F.2d 632, 635 (7th Cir. 1982). We have stated that the sight of a defendant in shackles "could instill in the jury a belief that the defendant is a dangerous individual who cannot be controlled, an idea that could be devastating to his defense." Id. at 637. Thus, when the defendant was shackled at trial, the key issues are whether the jury "was aware of" the shackles or whether the shackles "were readily visible." Fountain v. United States, 211 F.3d 429, 435 (7th Cir. 2000).

Because Roche raised his shackling claim in the context of ineffective assistance

of counsel, in order to prevail on this claim, Roche must demonstrate that: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance so prejudiced his defense that it deprived him of a fair trial. See Strickland, 466 U.S. at 687-88. There is no real question that Roche was in fact required to wear shackles during the guilt and penalty phases of his trial. However, the sole mention of this fact on the trial record is when immediately before Roche was to take the stand, his counsel requested, outside of the presence of the jury, that he would "like to have [Roche] seated at the witness chair before the jury comes in so they don't see his braces." We do not know why this is the first and only mention of Roche's shackling--the record is devoid of any of the facts that gave rise to the decision to shackle him. At the very least, this omission reveals the fact that his trial counsel made no record of any objection to Roche's shackling.

The Indiana Supreme Court held that counsel's failure to object to Roche's shackling did not constitute deficient performance because he was "careful about preventing the jury from seeing his client's ankle restraints [when Roche took the stand to testify]." Roche, 690 N.E.2d at 1123. The district court held that this was an "unreasonable application of" Strickland, stating that "Roche's counsel's failure to object on the record to the use of shackles is a clear example of deficient performance." Roche, 132 F. Supp.2d at 704. At the post-conviction hearing, a bailiff's testimony indicated that there was no drape covering Roche's shackles. Further, a witness recounted that during her testimony at trial, she could see Roche's shackles from the witness box. Most importantly, the jury box was directly next to the witness box, and therefore, Roche's shackles were "readily visible" to the jury. Fountain, 211 F.3d at 435.

Thus, not only did counsel fail to object to Roche's shackling, he also failed to ensure that Roche's shackles would not be visible to the jury while Roche was sitting at counsel's table during the entire trial. Accordingly, the issue that we are presented with is whether counsel's failure to object to

Roche's shackling plus his failure to ensure that the jury could not see the shackles constituted deficient performance. Cf. Harrell, 672 F.2d at 636-37 (drawing a distinction between cases where jury was "aware of" shackles because no precautions were taken and cases where precautions were taken to conceal shackles from jury).

   While the Indiana Supreme Court considered counsel's efforts to ensure that the jury would not see Roche'sshackles when Roche testified, counsel's failure to do so while Roche was sitting at counsel's table during trial and during the sentencing hearing was not addressed. Therefore, given that the key inquiry in shackling cases is whether the shackles were "readily visible" to the jury, Fountain, 211 F.3d at 435, we hold that in this case, the Indiana Supreme Court's determination that counsel was not deficient was unreasonable.

   Nevertheless, with respect to the guilt phase, Roche cannot establish that but for his counsel's deficient performance, the outcome of his trial would have been different. See Strickland, 466 U.S. at 694. In Fountain, we held that "in light of the substantial evidence of [the petitioner's] guilt posited at trial," the petitioner could not show that he was prejudiced by "his counsel's failure to object to . . . the jury's observation of his shackles." 211 F.3d at 436. We held:

All of the events leading up to [the petitioner's] involvement in the murder . . . from the pre-murder planning, to the murder itself and the post-murder admissions, were established and corroborated by witness testimony and physical evidence. Thus . . . [petitioner] has failed to establish that he was prejudiced by the allegedly defective assistance of counsel.

Id. (footnote omitted). In our case, the evidence showed that Roche planned the homicides with Niksich and told Duszynski that "he had some guys downstairs that he was going to shoot because [they] owed somebody $120." Further, on  numerous occasions, Roche bragged to his friends that he had killed Graves and Brown and cut out a newspaper article discussing the homicides. Finally, he confessed his

involvement in the homicides on a television news broadcast, to the police, and to a corrections officer. Thus, because of the overwhelming evidence of Roche's guilt, we cannot say that there was a "reasonable probability" that but for counsel's deficient performance, the result of the guilt phase of his trial would have been different. Strickland, 466 U.S. at 694.

However, we cannot reach the same conclusion with respect to the outcome of the penalty phase. During the sentencing hearing, there was considerable evidence concerning the mitigating circumstances to be considered under Ind. Code sec. 35-50-2-9(c). For example, the PSR indicated the circumstances of Roche's troubled childhood and alcohol and drug problems, Roche's criminal history was relatively minor, and Roche's family members testified about Roche's remorse and about their improved relations with him. In fact, after eight hours of deliberation, the jury was unable to recommend the death penalty for Roche. While not second-guessing the trial judge's determination on this issue, we note that whether the aggravating circumstances outweighed the mitigating circumstances in this case was apparently a closer call than whether there was sufficient evidence of Roche's guilt during the guilt phase. Moreover, given the extreme inherent prejudice associated with shackling, see, e.g., Harrell, 672 F.3d at 637, and the considerable mitigating evidence, we agree with the district court and conclude that Roche has established that there was a "reasonable probability" that but for his counsel's deficient performance, the result of his sentencing hearing would have been different. Strickland, 466 U.S. at 694.

In granting Roche's habeas petition, the district court held that it would "order Roche sentenced to life without parole." Roche, 132 F. Supp.2d at 704. However, at the time of Roche's offense, a sentence of life without parole was not an option under Indiana law, and the subsequently enacted life without parole statute cannot be applied retroactively. See Alcorn v. State, 638 N.E.2d 1242, 1244-45 (Ind. 1994) (stating that life without parole provision only applies to murders committed after June 30, 1993). Therefore, although we affirm the

district court's grant of Roche's habeas petition, we vacate its order for modification of his sentence and remand for the issuance of an order returning the case to state court and directing that Roche receive a new sentencing hearing. Roche's other arguments on appeal for why he should receive a new trial are without merit and warrant no discussion. Further, because we are ordering that Roche receive a new sentencing hearing, we need not address his argument that he received ineffective assistance of counsel during his initial sentencing hearing.

III. Conclusion

The district court's grant of habeas corpus is Affirmed; the disposition of resentencing by the district court is Vacated; and the case is Remanded to the district court for return to the Indiana state court for resentencing.

FOOTNOTES

/* Cecil Davis, Superintendent, has been substituted as appellant for Rondle Anderson, pursuant to Fed. R. App. P. 43(c).

/1 The Indiana Code provides that a "person who knowingly or intentionally kills another human being commits murder, a felony." Ind. Code sec. 35-42-1-1(1). Further, it provides that a "person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." Id. at sec. 35-42-1-1(2). In turn, the Indiana Code provides that a "person who knowingly or intentionally takes property from another person . . . by using or threatening the use of force on any person . . . commits robbery." Id. at sec. 35-42-5-1.

/2 The record does not identify in which newspaper this article appeared.

/3 AEDPA also allows habeas relief when the state court's determination of the facts was unreasonable in light of the evidence presented. 28 U.S.C. sec. 2254(d). However, Roche has not raised such a claim so we need not consider this prong of the statute.