In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-2747

MATTHEW E. WRINKLES,

*Petitioner-Appellant,*

*v.*

ED BUSS, Superintendent,[1]

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 01 C 1668—**John Daniel Tinder**, *Judge.*

_____

ARGUED SEPTEMBER 15, 2006—DECIDED AUGUST 12, 2008

_____

Before FLAUM, KANNE, and ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* This case is before the court on collateral review. In 1995, a Vanderburgh, Indiana, Circuit Court jury convicted Matthew Wrinkles of murdering his wife, his wife's brother, and his sister-in-law. The jury recommended and Judge Richard L. Young imposed a death sentence. Wrinkles unsuccessfully appealed his conviction and sentence to the Indiana Supreme Court, and

_____

[1] Ed Buss, who became superintendent of the Indiana State Prison after this appeal was filed, has been substituted for Daniel McBride as the appellee. *See* Fed. R. App. P. 43(c)(2).

thereafter, Judge Carl Heldt of the Vanderburgh Circuit Court denied his request for post-conviction relief. Wrinkles then filed a petition for a writ of habeas corpus, 28 U.S.C. § 2254, in the United States District Court for the Southern District of Indiana. Wrinkles argued that his constitutional rights were violated during the trial and sentencing proceedings because, pursuant to the Indiana trial judge's blanket policy of restraint, he was required to wear a stun belt that he alleges was visible to the jury.

Wrinkles was barred from raising a direct challenge to the constitutionality of the stun belt because he procedurally defaulted the claim in state court. Wrinkles instead claimed that he received ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), because his counsel failed to object to the imposition of the stun-belt restraint. With respect to the prejudice prong of *Strickland*, Wrinkles claimed that the jurors saw the stun belt, and that he presumptively suffered prejudice as a result. United States District Judge, John Daniel Tinder, concluded that Wrinkles could not demonstrate prejudice because the jury was not aware of the stun belt.

Wrinkles's habeas claim hinges on whether the jurors saw the stun belt during the trial and the sentencing proceedings. One passage in the Indiana Supreme Court's opinion—actually, one sentence—complicates our review. We ultimately conclude that the Indiana Supreme Court made no factual finding regarding the belt's visibility. The last state-court decision on point—the post-conviction court decision—holds that the jurors did not see the belt. We defer to that finding and agree with the district court that Wrinkles suffered no prejudice from his counsels' failure to object to the stun belt.

## I. History

*A. Factual history*

By the spring of 1994, the marriage of Matthew and Debbie Wrinkles was coming to an end. On May 3, 1994, police were dispatched to the Wrinkles' home in response to a report of gunfire. Wrinkles told the responding officers that he and Debbie were having financial and marital problems and that he would kill Debbie if she ever left him. David Plemmons, a witness to the events, would later testify that Wrinkles pointed a gun at Debbie during the argument and the gun discharged when Debbie grabbed it. According to Plemmons, Wrinkles hid the gun when the police arrived, and Debbie and Plemmons "covered" for Wrinkles by lying to the police about the incident. The Indiana Supreme Court later characterized the Wrinkles' relationship as "stormy and often violent." *Wrinkles v. State*, 690 N.E.2d 1156, 1159 (Ind. 1997) ("*Wrinkles I*"), *cert. denied*, 525 U.S. 861 (1998).

In June 1994, Debbie moved herself and the children—Lindsay, age thirteen, and Seth, age eight—to the home of Mark and Natalie Fulkerson, Debbie's brother and sister-in-law. This move marked the end of Wrinkles and Debbie's marriage, and Debbie filed for divorce on June 30. A few weeks later, on July 20, Wrinkles and Debbie attended a provisional divorce hearing, during which it was decided that Debbie would have custody of the children and Wrinkles would have visitation rights. Wrinkles and Debbie agreed to a meet at a fast-food restaurant later that day so that Wrinkles could see his children. But Debbie did not show that afternoon as scheduled.

Wrinkles had hit a low point in his life. He had a close relationship with his children and he believed that

his estranged wife and her family were conspiring to deny him access to the children. In addition to his marital problems, the automotive-repair business that he ran out of his garage was failing. Several zoning complaints had been made against his business and he was forced to shut down. Wrinkles had also been dependent on methamphetamine for some time, and this dependence caused him to become easily agitated and paranoid. In addition to his mental and emotional decay, his drug use caused him to wither away physically. Wrinkles's addiction kept him from sleeping, except sporadically, and he lost sixty pounds in a three-month period.

Wrinkles's obvious decline had begun to terrify Debbie. Her friend would testify at trial that Debbie had become a "nervous wreck." *Id.* at 1159. She had begun to take "medication [and] every time she heard a noise she would jump cause she was scared. And . . . she had to sleep with a gun underneath her pillow [because] she was scared" of Wrinkles.

Debbie's failure to appear with the children at the fast-food restaurant on July 20 set into motion a tragic series of events. Wrinkles called to complain to his divorce attorney, who told Wrinkles that nothing could be done until the next day because the courts had already closed. Wrinkles then called the Fulkerson home to speak with Debbie, but she was not there. Debbie returned Wrinkles's call later that evening, but she did not get an answer. Eventually, Debbie and the rest of the Fulkerson household turned in for the night on July 20. Given the growing tension in their lives, it was an uneasy rest; both Mark Fulkerson and Debbie had guns with them in their bedrooms.

Wrinkles drove to the Fulkerson home at approximately 2:00 a.m. on July 21, and parked his truck about one block

from the home. He was wearing camouflage clothing, had painted his face, and was armed with a .357 magnum revolver and a knife. He climbed over a fence into the Fulkersons' backyard. He cut the telephone wires and kicked in the back door, entering the home.

Wrinkles went down the hallway and into the Fulkersons' bedroom, where he shot Mark Fulkerson four times, killing him in front of his three-year-old son, Matthew. Debbie was awakened by the gunshots. She grabbed her gun and ran to the hallway where she confronted Wrinkles. She fired and hit him in the arm, knocking herself down in the process. At that point, Lindsay Wrinkles had also awakened and had come upon the confrontation between her parents. She saw that her father was about to shoot her mother and she "pleaded, 'Dad, please don't shoot Mom.'" *Wrinkles v. State*, 749 N.E.2d 1179, 1186 (Ind. 2001) ("*Wrinkles II*"), *cert. denied*, 535 U.S. 1019 (2002). Wrinkles responded by telling Lindsay to "shut up," and then he promptly shot Debbie.

During the commotion, Natalie Fulkerson made her way to the living room and out the front door, in an attempt to flee. Wrinkles gave chase and caught Natalie on the front porch, shooting her in her face at close range. Natalie died on the porch. Wrinkles fled. The Fulkersons' ten-year-old daughter, Kimberly, and her 19-year-old cousin, Tracy, ran to neighbors' houses for help.

Wrinkles was arrested later that morning in a neighboring county and was charged with three counts of murder, pursuant to Ind. Code § 35-42-1-1(1), for knowingly killing his victims. The state filed notice of its intent to seek the death penalty on July 28, 1994. Under Indiana law, the state can seek the death penalty when a defendant commits multiple murders. Ind. Code § 35-50-2-9(b)(8).

*B. Procedural history*

Based on their pre-trial investigations, Wrinkles's attorneys' theory of his defense centered on the fact that, at the time of the crimes, Wrinkles was in the midst of a very difficult period in his life. The attorneys decided to stress the loss of Wrinkles's business, the break-up of his marriage, and his perception that Debbie and the Fulkersons were trying to keep his children from him. The defense argued that Wrinkles had broken into the Fulkersons' home with the intent of retrieving his children because he feared that he would never see them again—a paranoia magnified by his methamphetamine addiction. The paranoia was further enhanced when, according to Wrinkles, his victims confronted him with guns when he entered the home. Wrinkles also would cast Debbie as the aggressor in their confrontation in the hallway; he would testify that Debbie said, "Die, you bastard, die," when she shot him. *Wrinkles I*, 690 N.E.2d at 1159.

This strategy was necessary given the facts of the case. First, there was no dispute that Wrinkles had shot the three victims, and therefore Wrinkles's motivation for the shootings would be the primary issue at trial. And Wrinkles's state of mind would likewise be a significant issue for sentencing in terms of whether the death penalty or a lesser sentence was appropriate. In addition, the attorneys concluded that although Wrinkles's mental state might impact his culpability and sentence, the facts did not support an insanity defense. A neuropsychologist enlisted by Wrinkles's attorneys concluded that, while Wrinkles suffered from a Mixed Personality Disorder and a Delusional Disorder that became more intense during the weeks leading up to the shootings, and while Wrinkles's judgment was substantially impaired at the

time of the shootings, he was nonetheless sane because he had known what he was doing and was able to conform his conduct to the requirements of the law.

Before trial commenced, the trial judge informed Wrinkles's counsel that Wrinkles would have to wear some sort of restraining device—either shackles or a stun belt. The trial court did not make a specific finding that Wrinkles presented a risk of danger, escape, or courtroom disruption. But "the trial court apparently [had] a policy of requiring defendants to wear restraints regardless of whether they [had] previously exhibited any conduct justifying restraints." *Wrinkles II*, 749 N.E.2d at 1195. According to the Indiana Supreme Court in *Wrinkles II*, a stun belt is a restraining device that is placed around an individual's waist as an alternative to leg-irons or shackles. The battery-powered belt has two prongs that are placed over the wearer's kidney region. A court bailiff or other law-enforcement officer can activate the belt by a remote control and, once activated, it sends a shock to the wearer that cannot be stopped. The electrical shock travels through the body via blood channels and nerve pathways. The shock knocks down most people, incapacitates them for up to 45 minutes, and causes them to shake uncontrollably. The individual may also have uncontrollable defecation and urination, irregular heartbeats, seizures, and welts, due to the shock. Wrinkles's attorneys did not object to the mandatory restraint policy. When faced with the choice of shackles or a stun belt, they opted for the latter, reasoning that there was less likelihood that the jury would see the belt during trial.

A jury found Wrinkles guilty of all three counts of murder, and recommended the death penalty; the trial

judge sentenced Wrinkles to death. Wrinkles appealed
his conviction and death sentence, raising a number of
evidentiary claims and challenging both Indiana's death-
penalty statute and his own sentence. He did not, how-
ever, appeal the trial court's blanket policy of requiring
him to wear the stun belt at trial. Unpersuaded, the Indi-
ana Supreme Court affirmed Wrinkles's convictions
and sentence (*Wrinkles I*).

Thereafter, Wrinkles filed a petition for post-conviction
relief, in which he challenged the constitutionality of the
stun belt and raised ineffective-assistance-of-counsel
claims, among other claims. Central to his claim for post-
conviction relief were three affidavits from jurors in his
trial who claimed to have seen the stun belt. The post-
conviction court discounted the reliability of the affidavits
and upheld Wrinkles's convictions and sentence:

> The trial court did not strip the presumption of
> innocence from Petitioner by requiring him to wear
> the belt. The purpose of the belt is to maintain
> control over a prisoner *without* the prisoner appear-
> ing restrained. Petitioner did not prove that the belt
> was visible or that the jury knew about it. The
> affidavits from three jurors that they knew about
> the belt from the trial court, the bailiff, and/or
> newspaper articles read after trial, and Petitioner's
> appearance during trial are insufficient. First, the
> juror affidavits are inconsistent with each other.
> One juror stated that the jury was not told why
> Petitioner wore the belt, while another juror
> averred that the trial court told the jury about the
> belt to assure the jurors that they would be safe.
> Second, some of the juror affidavits are inconsistent
> with bailiff Todd Woodmansee's affidavit that he
> did not tell the jury about the belt. Third, both [of

> Wrinkles's attorneys] testified that the belt was not visible during trial. Fourth, the juror affidavits were not subjected to cross-examination. Because petitioner did not *appear* restrained during the trial, he was not stripped of the presumption of innocence.

Vanderburgh Circuit Court's Findings of Fact, Conclusions of Law and Judgment on Petition for Post Conviction Relief, *Wrinkles v. State*, No. 82C01-9407-CF-447 (Sept. 3, 1999) (emphasis in original).

After the post-conviction court rendered its decision, Wrinkles filed with that court a Motion to Correct Error, to which he attached new affidavits from additional jurors, who claimed to have seen the stun belt during trial. The post-conviction court did not grant Wrinkles's motion, nor did it admit the additional juror affidavits into evidence.

Wrinkles then appealed the post-conviction court's ruling to the Indiana Supreme Court. Relying on Indiana law, the supreme court in *Wrinkles II* prospectively banned the use of stun belts in Indiana courts. The court was specifically concerned with the mental impact on a defendant who might be afraid about the potential infliction of pain from the belt, and how this mental concern could impact the defendant's ability to participate in his own defense. *Wrinkles II*, 749 N.E.2d at 1194.

But the Indiana Supreme Court denied Wrinkles the benefit of its holding. The court held that Wrinkles's claim was procedurally defaulted because Wrinkles had failed to raise the issue on direct appeal. In addition, the court held that Wrinkles had not suffered from ineffective assistance of counsel when his attorneys failed to

object to the use of the stun belt at his trial. The court characterized Wrinkles's attorneys' choice to acquiesce to the stun belt as a "strategic decision":

> Before trial began, the trial court informed counsel that Wrinkles would have to wear either shackles or a stun belt during trial. Without objection counsel chose a stun belt, and Wrinkles claims they rendered ineffective assistance as a result. We disagree. Although with this opinion we declare that stun belts no longer have a place in Indiana courtrooms, that was not the case at the time of Wrinkles' trial. Our prohibition is motivated primarily by the potential effect a stun belt may have upon the person wearing the device. However, without the benefit of this declaration, counsel were concerned about the effect on the jurors if they were to observe their client wearing a particular device. Counsel believed that the chance of the jury seeing the shackles was fairly high. On the other hand, counsel opted for the stun belt because they thought that jurors would not be able to see it. Obviously, they were later proven wrong. However, at the time the decision was made, it was a prudent one.

Wrinkles filed a petition for a writ of habeas corpus under 28 U.S.C. § 2554, in the United States District Court for the Southern District of Indiana. He presented a host of arguments, all of which Judge Tinder, rejected. *Wrinkles v. McBride*, No. IP 01-1668-C-T/K (D. Ind. May 18, 2005) (Entry Discussing Petition for Writ of Habeas Corpus). With respect to the constitutionality of the stun belt itself, the district court held that the claim could not be presented under § 2254 because it had been procedurally

defaulted in state-court proceedings. Further, Judge Tinder held that even if the claim had not been waived, it lacked merit. Judge Tinder credited the post-conviction court's finding that the jurors were not aware of the stun belt and the belt was not visible.

Thereafter, Wrinkles filed a Request for Certificate of Appealability ("C.A.") on two issues: (1) "Whether [he] was unconstitutionally restrained by virtue of wearing a stun belt at his trial," and (2) "Whether [his] counsel rendered ineffective assistance of counsel at the 'guilt phase' of trial." Judge Tinder granted Wrinkles a C.A. on the issue of the constitutionality of the use of the stun belt, but denied the request as to his ineffective-assistance-of-counsel claims. This appeal followed.

## II. ANALYSIS

On appeal, Wrinkles's first argues that the district court erred in finding that his stun-belt claim was procedurally defaulted because the default was the result of ineffective assistance of counsel. As for his freestanding constitutional claim, he argues that his Sixth, Eighth, and Fourteenth Amendment rights were violated when he was forced to wear the stun belt without an independent assessment of the need for restraints.[2]

---

[2] Wrinkles also seeks an expansion of the C.A. to include his non-stun-belt ineffective-assistance-of-counsel arguments. For the reasons stated by the district court, we deny his request to expand the C.A. to include the additional claims on appeal. *See Herrera v. United States*, 96 F.3d 1010, 1013 (7th Cir. 1996).

*A. Procedural default*

Before analyzing Wrinkles's substantive § 2254 claims, we must first determine whether Wrinkles procedurally defaulted his argument that wearing the stun belt violated his constitutional rights. *Lee v. Davis*, 328 F.3d 896, 899 (7th Cir. 2003) ("As a threshold matter, we must determine whether Lee has procedurally defaulted his argument . . . ."). The district court decided that Wrinkles had defaulted his argument—a decision we review *de novo. Id.* As a general matter, considerations of "finality, comity, and the orderly administration of justice" preclude this court from reaching claims that a habeas petitioner has procedurally defaulted in state court. *Dretke v. Haley*, 541 U.S. 386, 388 (2004). The criminal trial is a "decisive and portentous event" and, as such, the state has an interest in ensuring timely compliance with those procedures that permit the jury accurately to "decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). For these reasons, a valid state procedural rule constitutes an "adequate and independent state ground" for resolving an issue, precluding this court from doing so collaterally. *Id.* at 86-87.

Wrinkles sought federal habeas corpus review of federal-law issues that the Indiana Supreme Court disposed of based on adequate and independent state-law grounds. Specifically, Wrinkles's "freestanding" stun belt claims—that his rights to a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was required to wear a stun belt without a hearing—were deemed by the Indiana Supreme Court to have been waived as a matter of

state law. *Wrinkles II*, 749 N.E.2d at 1186-87 & 1187 n.3. The procedural rule cited by the Indiana Supreme Court provides an "adequate and independent state ground" for resolving Wrinkles's constitutional claims. Indiana courts have long recognized, and the *Wrinkles II* court reaffirmed, that "[c]laims that are available, but not presented, on direct appeal are waived for post-conviction review unless the claimed error is fundamental." *Id.* at 1187 n.3; *see also Adams v. State*, 575 N.E.2d 625, 628 (Ind. 1991). Thus, the district court was correct to conclude that Wrinkles's substantive claim was procedurally barred.

### B.  *Excuse for procedural default*

To keep his freestanding constitutional claim alive, Wrinkles argues that his procedural default is excusable under the standard set forth in *Wainwright v. Sykes*, 433 U.S. at 90. A defendant may overcome procedural default by showing both "cause" for failing to abide by the state procedural rules, and a resulting "prejudice" from that failure.[3] *Id.* at 87. Specifically, Wrinkles argues that

---

[3] The Supreme Court has recognized an additional way to avoid procedural default if the default would result in a "fundamental miscarriage[ ] of justice." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *See generally* 6 Wayne R. LaFave, et al., Criminal Procedure 64-65 (2d ed. 2004). A miscarriage of justice exists in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. In the capital context, one can show "actual innocence" through "clear and convincing evidence that, but for a constitutional error, no

(continued...)

the freestanding stun-belt claim is procedurally defaulted solely because of his trial attorneys' ignorance of the law, a fact that renders his counsel ineffective and that provides cause to excuse a procedural default. *Murray*, 477 U.S. at 496.

Attorney error rising to the level of ineffective assistance of counsel can constitute cause to set aside procedural default. *Franklin v. Gilmore*, 188 F.3d 877, 883 (7th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir. 1994)). When a habeas petitioner seeks to excuse a procedural default through an ineffective-assistance claim, the "cause" and "prejudice" test from *Wainwright* is replaced by the similar test for ineffective assistance set out in *Strickland v. Washington*, 466 U.S. at 668. *See Murray*, 477 U.S. at 479 ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective . . . there is no inequity in requiring him to bear the risk of attorney error that results in a procedural default."); *see also Lee*, 328 F.3d at 900.

"To establish ineffective assistance of counsel, the [petitioner] must show that counsel's performance was deficient and that the deficient performance prejudiced the [petitioner]." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Strickland*, 466 U.S. at 687). A

---

[3] (...continued)
reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). Wrinkles has not, and cannot, make any claim of innocence. As for his sentence, although Wrinkles has not raised this issue, this analysis closely mirrors our analysis under the prejudice prong of *Strickland*.

"constitutionally deficient performance is one that falls below an objective standard of reasonableness under prevailing professional norms." *Shell v. United States*, 448 F.3d 951, 954-55 (7th Cir. 2006) (citing *Granada v. United States*, 51 F.3d 82, 83 (7th Cir. 1995)). And to show prejudice, the defendant must prove that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Raygoza v. Hulick*, 474 F.3d 958, 963 (7th Cir. 2007) (quoting *Strickland*, 466 U.S. at 694). In Wrinkles's case, if his attorneys' decision not to object to the stun belt fell short of objectively reasonable performance and prejudiced him, the Sixth Amendment was not satisfied and this court will excuse Wrinkles's procedural default.

Wrinkles's ineffective-assistance claim was preserved for collateral review. *Lee*, 328 F.3d at 901 (citing *Edwards v. Carpenter*, 529 U.S. 446 (2000)). The Indiana Supreme Court reached—and ultimately rejected—Wrinkles's claim as an excuse for his procedural default. In reviewing the Indiana Supreme Court's decision, we are deferential towards its legal and factual conclusions. *Raygoza*, 474 F.3d at 963; *Neumann v. Jordan*, 84 F.3d 985, 987 (7th Cir. 1996) ("In reviewing the state court proceedings, we presume that the factual findings of the state court are correct if those findings follow a hearing on the merits and are fairly supported by the record."). Likewise, the Indiana Supreme Court's legal conclusions will be upheld unless they resulted in a decision that was "(1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) based on

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

1. *Substandard performance by counsel*

Wrinkles argues, and we agree, that his counsel's performance at trial fell below prevailing norms of professional behavior. The Indiana Supreme Court correctly identified *Strickland* as the governing law; thus, Wrinkles will only gain relief if the court unreasonably applied the standard to the facts of his case. 28 U.S.C. § 2254(d)(2). In evaluating the reasonableness of the Indiana Supreme Court's application of *Strickland*, we must ask whether the court was "objectively unreasonable," *Williams v. Taylor*, 529 U.S. 362, 409 (2000), meaning that its reasoning falls outside of the " 'boundaries of permissible differences of opinion.' " *Raygoza*, 474 F.3d at 964 (quoting *Hardaway v. Taylor*, 302 F.3d 757, 762 (7th Cir. 2002)).

The Indiana Supreme Court held that Wrinkles's counsels' decision not to object to the stun belt at trial was strategic and thus adequate. The supreme court first noted that the Indiana trial court had a stated "policy" of "requiring defendants to wear restraints regardless of whether they have previously exhibited any conduct justifying restraints." *Wrinkles II*, 749 N.E.2d at 1195. The trial court had given Wrinkles's attorneys the choice of wearing shackles or the stun belt at trial. Because they thought that "the chance of the jury seeing the shackles was fairly high," Wrinkles's attorneys chose the stun belt. *Id.* The supreme court characterized this as a "strategic decision" because, unlike shackles, Wrinkles's attorneys "thought the jurors would not be able to see" the

belt. *Id.* In addition, because the trial court would have overruled any objection to the stun belt—per its stated restraint "policy"—Wrinkles could not demonstrate that his trial would have been any different if his attorneys had objected. *Id.* ("[E]ven though the trial court's policy would not likely withstand appellate scrutiny if the issue were presented, it is apparent that at least at the time of Wrinkles's trial, an objection to wearing restraints would not have been sustained by the trial judge even if made."). Thus, the supreme court concluded, the decision was strategic and Wrinkles could not show a substandard performance by his trial counsel. We disagree.

At the time of Wrinkles's trial, it was well established that a trial court could not restrain a criminal defendant absent a particularized justification. In *Illinois v. Allen*, the Supreme Court held that a defendant could forfeit his Sixth Amendment right to be present and unrestrained at his own trial. 397 U.S. 337 (1970). The Court sanctioned the use of physical restraints "as a last resort," *id.* at 344, and articulated a framework for handling "obstreperous" defendants that tied the trial court's response to the seriousness of the defendant's conduct, *id.* at 343-42. The Court applied this framework next in *Estelle v. Williams*, 425 U.S. 501 (1976), in which the defendant appeared before the jury in prison garb. Unlike *Allen*, which recognized "the substantial need to impose physical restraints upon contumacious defendants," the Court in *Estelle* decided that forcing "an accused to wear jail clothing further[ed] no essential state policy." *Id.* at 505.

Again in *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986), the Supreme Court applied this framework when evaluating the presence of armed guards at a defendant's trial. The Court concluded that the presence of armed guards

was not the "sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568-69. The need for a particularized justification had not gone unnoticed by Indiana courts either. The Indiana Supreme Court held in *Coates v. State*, that particularized reasoning must support a decision to restrain a defendant, going so far as to require that "the facts and reasoning supporting the trial judge's determination that restraints are necessary must be placed on the record." 487 N.E.2d 167, 168-69 (Ind. 1985).

In Wrinkles's case, his attorneys did not object to the use of the stun belt because they concluded that the trial court was going to require restraints no matter what. But these cases make clear that particularized reasoning must support any decision to restrain a defendant. In light of the wealth of caselaw prohibiting the trial court's blanket policy, by standing mute, Wrinkles's counsel failed to provide adequate legal assistance. Failing to object when a trial court presents two impermissible options—shackles or a stun belt, neither supported by individualized justification—cannot be an objectively reasonable tack under prevailing norms of professional behavior. *See Strickland*, 466 U.S. at 686 ("Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render 'adequate legal assistance.' "); *see also Barrow v. Uchtman*, 398 F.3d 597, 605 (7th Cir. 2005) (holding ignorance of relevant law objectively deficient under *Strickland*); *Dixon v. Snyder*, 266 F.3d 693, 703 (7th Cir. 2001) (same). Counsels' choice between two unconstitutional options is not a strategic choice worth deference. Accordingly, the Indiana Supreme Court unreasonably applied *Strickland*'s first prong.

2. *Prejudice*

Standing alone, the attorneys' failure to request an inquiry into the justification for the stun belt is not ineffective assistance. Some prejudice is required before a trial counsel's performance falls below the constitutional minimum. *Strickland*, 466 U.S. at 691-692. Without demonstrating prejudice, Wrinkles cannot receive relief on the ground of ineffective assistance of counsel, *id.*, or on the basis of his freestanding constitutional claims regarding the stun belt, because the latter claim was procedurally defaulted at the state level.

Wrinkles argues that he was prejudiced because, in his opinion, the jurors were aware that he was restrained by the stun belt and were thus more inclined to view him as a dangerous person. In turn, he argues, the jurors were more likely to determine that he had the requisite mindset to commit murder, instead of a lesser crime, and were more willing to vote for the death penalty. If the jurors did see the stun belt during trial, then Wrinkles could demonstrate prejudice. *See Allen*, 397 U.S. at 344; *Roche*, 291 F.3d at 482-83; *Harrell v. Israel*, 672 F.2d 632, 635 (7th Cir. 1986) ("[C]ourts must guard against practices which unnecessarily mark the defendants as a dangerous character or suggest that his guilt is a foregone conclusion."). Thus, Wrinkles's habeas petition hinges on the belt's visibility; the belt's visibility is a question of fact that was resolved by the state post-conviction court and upheld by the Indiana Supreme Court.

The post-conviction court determined that Wrinkles had not demonstrated that the jurors had seen the stun belt or that Wrinkles had otherwise been affected by it. The Indiana Supreme Court affirmed the post-conviction court. Wrinkles contends, however, that the supreme

court made an implicit factual finding that the belt was
visible to the jury. He bases his argument on a state-
ment in *Wrinkles II* that indicates that Wrinkles's attor-
neys "were later proven wrong."[4] This sentence follows
the court's discussion of the attorneys' decision not to
challenge the trial court's imposition of the stun belt-
restraint:

---

[4] Wrinkles also claims that the Indiana Supreme Court recog-
nized that the stun belt was "conspicuous to at least seven
jurors." However, Wrinkles takes this quotation in *Wrinkles II*
out of context. The full sentence is one of three in a paragraph
the Indiana Supreme Court uses solely to *summarize* Wrinkles's
ineffective-assistance-of-counsel argument with respect to the
stun belt. The entire sentence reads: "Wrinkles asserts that
utilization of the stun belt, which was conspicuous to at least
seven jurors, undermined his presumption of innocence and
made him appear dangerous and uncontrollable in front of the
jurors who would help decide whether he would live or die."
*Wrinkles II*, 749 N.E.2d at 1192 (citing Appellant's Br. at 29;
Appellant's Reply Br. at 11). The sentence begins with "Wrinkles
asserts." The preceding sentence in the paragraph, which
introduces Wrinkles's argument, begins with, "Wrinkles
contends." The subsequent sentence starts with, "He claims."
Taken in context, it is clear that the Indiana Supreme Court
was merely presenting Wrinkles's argument, including his
argument that the belt was visible to seven jurors.

We cannot fathom the notion that, in the middle of three
paraphrasing sentences, the *Wrinkles II* court would have
perfunctorily inserted a clause containing a factual finding,
without indicating it as such. Courts often present a party's
argument in order to present the issue it will proceed to con-
sider, and it is apparent that the Indiana Supreme Court was
doing this in *Wrinkles II*. Consequently, we reject Wrinkles's
argument that this clause is a finding of fact by the *Wrinkles II*
court that the stun belt was visible to jurors.

> Before trial began, the trial court informed counsel that Wrinkles would have to wear either shackles or a stun belt during trial. Without objection counsel chose a stun belt, and Wrinkles claims they rendered ineffective assistance as a result. We disagree. Although with this opinion we declare that stun belts no longer have a place in Indiana courtrooms, that was not the case at the time of Wrinkles' trial. Our prohibition is motivated primarily by the potential effect a stun belt may have upon the person wearing the device. However, without the benefit of this declaration, counsel were concerned about the effect on the jurors if they were to observe their client wearing a particular device. Counsel believed that the chance of the jury seeing the shackles was fairly high. On the other hand, counsel opted for the stun belt because they thought that jurors would not be able to see it. Obviously, they were later proven wrong. However, at the time the decision was made, it was a prudent one.

*Wrinkles II*, 749 N.E.2d at 1195.

Wrinkles believes the "Obviously, they were later proven wrong" sentence amounts to a finding of fact by the Indiana Supreme Court that the jurors saw the stun belt. We disagree with that interpretation of the sentence. To begin, we do not believe the Indiana Supreme Court would have made a factual finding in this manner, especially as it affirmed the post-conviction court and did not overturn any of the post-conviction court's factual findings. More importantly, we do not read this statement to reveal anything about the stun belt's visibility. Rather, the statement reflects the Indiana Supreme Court's opinion that Wrinkles's attorneys could not be faulted for

having taken into account only the potential visibility of a particular restraint in deciding whether to object to a court's use of the restraint—because Indiana law at the time focused on the harm stemming from visible restraints.

### a. Indiana law on factual findings

In the "deferential and limited review" of 28 U.S.C. § 2254, "state court factual findings are presumed correct." *Williams v. Bartow*, 481 F.3d 492, 498 (7th Cir. 2007). On the issue of the belt's visibility, the state post-conviction court considered three juror affidavits, affidavits from the trial bailiff, and testimony from Wrinkles's attorneys to decide whether the jurors saw or knew about the stun belt. The court discredited the juror affidavits. The affidavit of one juror stated that at the time she served on the jury, she was aware that Wrinkles was wearing a stun belt—she said it "looked like a cumberbund [sic]." However, she said she was unsure how she learned of the stun belt, and that she may have learned of it through a newspaper article she read *after* the trial. Another juror said in his affidavit that he was aware that Wrinkles was wearing a stun belt during his trial, and that he believed the trial *judge* told the jurors about the stun belt to give the jurors confidence in their safety. A third juror, in contrast, said that he thought the *bailiff* told the jury about the stun belt, but he said the jury was not told why Wrinkles was wearing the belt. The post-conviction court held that the affidavits were insufficient because they were inconsistent with each other—calling into question their credibility—and because they contradicted the bailiff's testimony, as well as Wrinkles's attorneys' testimony. The bailiff swore in his affidavit that he "never communicated to any of the jurors at any time during the trial that [Wrinkles] was wearing a rack belt."

After it had rendered its judgment denying Wrinkles's request for post-conviction relief, the post-conviction court denied Wrinkles's subsequent motion to correct error, motion to reopen the evidence, and request for leave to amend his petition for post-conviction relief. Wrinkles proffered with each of these pleadings copies of four more juror affidavits. (A fifth affidavit was attached to a motion to supplement the motion to reopen the evidence.) However, these affidavits were *never* admitted into evidence by the post-conviction court, and there is no indication whatsoever that the Indiana Supreme Court weighed the additional affidavits as part of its analysis in *Wrinkles II.*

Notably, Wrinkles did not raise as issues on appeal to the Indiana Supreme Court the post-conviction court's denial of his post-judgment motions and request for leave to amend his petition based on the additional juror affidavits. In Indiana, a motion to correct error does not allow a party to present evidence it merely neglected to present at trial, *Roach v. State*, 695 N.E.2d 934, 940 n.1 (Ind. 1998), and a motion to reopen the evidence lies within the sound discretion of the trial judge, *Walker v. State*, 587 N.E.2d 675, 677 (Ind. 1992). A judge typically does not abuse his discretion in refusing to reopen evidence "when it plainly appears that such evidence could have been offered earlier," *Preuss v. McWilliams*, 230 N.E.2d 789, 792 (Ind. Ct. App. 1967), or when the proffered evidence is cumulative, *Oxendine v. Pub. Serv. Co. of Ind., Inc.*, 423 N.E.2d 612, 623 (Ind. Ct. App. 1980). The additional affidavits Wrinkles sought to have admitted into the evidentiary record of the post-conviction court were never admitted—they remain mere attachments to state-court motions and thus should not form the basis of a federal habeas decision.

Having not appealed the post-conviction court's refusal to admit the additional affidavits into evidence, Wrinkles's reliance on the additional affidavits in his post-conviction appeal to the Indiana Supreme Court seems analogous to the petitioner's reliance on similar affidavits in *Patton v. State*, 537 N.E.2d 513 (Ind. Ct. App. 1989). In *Patton*, the petitioner felt that because his attorney had failed to present the evidence to the trial court, "he should be allowed to present it by affidavits with his Motion to Correct Errors." *Id.* at 516. The Indiana Court of Appeals explained that Indiana Trial Rule 59(H)(1), dealing with motions to correct error, "was not designed for this purpose." *Id.* The *Patton* court went on to conclude that the affidavits "were not properly before the trial court as evidence outside the record"—they did not qualify as newly discovered evidence and Patton had neglected to submit them at trial. *Id.* Because the affidavits were not properly before the Indiana Court of Appeals, the *Patton* court declared: "we *cannot consider them* in reviewing the trial court's action." *Id.* (emphasis added).

If under state law the Indiana Supreme Court would not have looked at the additional affidavits in its direct review of the post-conviction court's findings, *see Roach*, 695 N.E.2d at 940 n.1; *Walker*, 587 N.E.2d at 677; *Preuss*, 230 N.E.2d at 792, certainly we are not at liberty to weigh them on collateral review under § 2254, where our review is limited to arguments that were adjudicated on the merits in state court proceedings, 28 U.S.C. § 2254(d), and arguments that were not procedurally defaulted, *id*. § 2254(b). Here, Wrinkles *did not appeal* the post-conviction court's refusal to admit the additional affidavits into evidence. Absent a reversal of the post-conviction court's rulings on these affidavits by the Indiana Supreme Court,

and absent any indication by the *Wrinkles II* court that it nonetheless decided to consider the additional affidavits, we are not free to engage in an independent assessment of the affidavits' weight and the affiants' credibility.

The *Wrinkles II* opinion itself suggests that the Indiana Supreme Court adopted the post-conviction court's findings of fact *in toto*. The supreme court acknowledged the post-conviction court's factual findings and identified the standard of review called for under Indiana law:

> In the present case, the post-conviction court entered findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made.

*Wrinkles II*, 749 N.E.2d at 1188. After reviewing the post-conviction court's findings and conclusions of law with respect to each of Wrinkles's arguments on appeal, the *Wrinkles II* court ultimately declared that Wrinkles "failed to prove that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Id.* at 1203. It then affirmed the post-conviction court's denial of Wrinkles's petition for relief. *Id.*

The *Wrinkles II* court did not reverse the findings of the post-conviction court, either explicitly or implicitly. The Indiana Supreme Court has repeatedly noted that a post-conviction court's findings of fact are accepted unless "clearly erroneous," and that the "postconviction court is the *sole judge of the weight of the evidence and the credibility of witnesses." Fisher v. State*, 810 N.E.2d 674, 679 (Ind.

2004); *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002); *Woods v. State*, 701 N.E.2d 1208, 1210 (Ind. 1998) (emphasis added); *see also Stewart v. State*, 517 N.E.2d 1230, 1231 (Ind. 1988) ("The judge who presides over the post-conviction hearing possesses *exclusive authority to weigh the evidence* and determine the credibility of the witnesses. The reviewing court will therefore not set aside the trial court's ruling on a post-conviction petition unless the evidence is without conflict and leads solely to a result different from that reached by the trial court.") (emphasis added). The Indiana Supreme Court in *Wrinkles II* did not suggest in any way that it considered the additional affidavits that had never been admitted into the evidentiary record. Nor did the court say it was engaging in a *de novo* reweighing of the evidence in *Wrinkles II*—indeed it appears it would not have done so as a matter of Indiana law. *See Fisher*, 810 N.E.2d at 679; *Davidson*, 763 N.E.2d at 444; *Woods*, 701 N.E.2d at 1210. Finally, nothing in the *Wrinkles II* opinion indicates that the Indiana Supreme Court was overturning the post-conviction court's factual findings, or that those findings were clearly erroneous.

*b. Our reading of "Obviously, they were later proven wrong."*

Despite a degree of ambiguity surrounding the "Obviously, they were later proven wrong" sentence in *Wrinkles II*, we conclude that the Indiana Supreme Court was commenting on the process by which Wrinkles's attorneys decided not to object to the stun-belt restraint—as opposed to commenting on the belt's visibility. In the disputed passage, the court first explained that it had just invalidated the use of stun belts based on a type of prejudice unavailable to Wrinkles's counsel at the time of

trial—the "potential effect . . . upon the person wearing the device." The court then set out the choice of restraint facing Wrinkles's attorneys at trial in light of the only theory of prejudice then available—the "effect on the jurors." Lastly, the court explained why, based on this latter theory of prejudice, counsel's decision to choose the stun belt was a "prudent one" even though the attorneys were "later proven wrong" to examine their choice solely based on "the effect on the jurors."

In rejecting Wrinkles's claim that he had received ineffective assistance of counsel, the court stated, in relevant part:

> Before trial began, the trial court informed counsel that Wrinkles would have to wear either shackles or a stun belt during trial. Without objection counsel chose a stun belt, and Wrinkles claims they rendered ineffective assistance as a result. We disagree. Although with this opinion we declare that stun belts no longer have a place in Indiana courtrooms, that was not the case at the time of Wrinkles' trial. Our prohibition is motivated primarily by the potential effect a stun belt may have upon the person wearing the device. However, without the benefit of this declaration, counsel were concerned about the effect on the jurors if they were to observe their client wearing a particular device. Counsel believed that the chance of the jury seeing the shackles was fairly high. On the other hand, counsel opted for the stun belt because they thought the jurors would not be able to see it. Obviously, they were later proven wrong. However, at the time the decision was made, it was a prudent one.

*Wrinkles II*, 749 N.E.2d at 1195 (citations omitted).

The last few sentences of this quoted section—particularly the sentence "[o]bviously, they were later proven wrong"—are not entirely unproblematic. One could read this second-to-last sentence as referring back to the court's statement that "the jurors would not be able to see it," with the "it" referring to the stun belt. So read, this could be seen as an implicit finding that the jurors had in fact seen the stun belt and that Wrinkles's attorneys "were later proven wrong" about their contrary assumption. In turn, this would suggest that the stun belt may have prejudiced the defendant.

We cannot conclude that this is the appropriate reading for two reasons: (1) the quoted section is more consistent with a discussion of the choice facing Wrinkles's attorneys in light of the then-established prejudice associated with restraints; and (2) Indiana law as well as subsequent guidance by the Indiana Supreme Court sheds light on the more plausible reading. Parsing the above-quoted section, the paragraph begins:

> Before trial began, the trial court informed counsel that Wrinkles would have to wear either shackles or a stun belt during trial. Without objection counsel chose a stun belt, and Wrinkles claims they rendered ineffective assistance as a result. We disagree. Although with this opinion we declare that stun belts no longer have a place in Indiana courtrooms, that was not the case at the time of Wrinkles' trial.

749 N.E.2d at 1195. The issue before the court was whether Wrinkles's counsel "rendered ineffective assistance" when "[w]ithout objection counsel chose a stun belt" after "the trial court informed counsel that Wrinkles would have to wear either shackles or a stun belt during trial." In the immediately preceding paragraphs of the opinion, the

supreme court had just held that "stun belts no longer ha[d] a place in Indiana courtrooms." But this did not end the inquiry because "that was not the case at the time of Wrinkles' trial," when the counsel rendered their assistance. In prospectively banning stun belts, the court had relied on a form of prejudice that was unproven at the time of Wrinkles's trial. The supreme court continued:

> Our prohibition is motivated primarily by the potential effect a stun belt may have upon the person wearing the device. However, without the benefit of this declaration, counsel were concerned about the effect on the jurors if they were to observe their client wearing a particular device.

*Id*. In *Wrinkles II*, the court reasoned that the prejudice from a stun belt resulted not from the jury being able to see the defendant in restraints, but from "the potential effect a stun belt may have upon the person wearing the device." This form of prejudice marked a departure from preexisting case law, which had only discussed prejudice in terms of the defendant's visibility before the jury in restraints. *Id*. at 1193-95; *see also Stephenson v. Indiana*, 864 N.E.2d 1022, 1029, 1032 (Ind. 2007) (discussing reasonableness of counsel's choice "given that the case law addressing the issue had largely focused on the visibility of the restraint, and not, as *Wrinkles* later pointed out, on the belt's potential effect on the defendant's demeanor and ability to participate in the defense"). Understandably then, "without the benefit of this declaration, [Wrinkles's] counsel were concerned" instead with the more established form of prejudice associated with restraints: "the effect on the jurors if they were to observe their client wearing a particular device."

The question then became whether effective counsel would have accounted for the new form of prejudice just

identified in banning stun belts. But the supreme court said no; the failure to object was not ineffective assistance. In reaching this conclusion, the court first recreated the decision facing Wrinkles's counsel in choosing the restraint to be used:

> Counsel believed that the chance of the jury seeing the shackles was fairly high. On the other hand, counsel opted for the stun belt because they thought the jurors would not be able to see it.

*Wrinkles II*, 749 N.E.2d at 1195. In other words, after assuming that they need only consider the effect on the jurors, the attorneys chose the stun belt because it posed the least risk of being seen by the jurors when compared to the shackles.

Immediately following the court's articulation of these two options and the rationale behind the attorneys' choice, the court continued,

> Obviously they were later proven wrong. However, at the time the decision was made, it was a prudent one.

*Id*. This first sentence refers back to the court's statement that "counsel opted for the stun belt because they thought the jurors would not be able to see it." Wrinkles's attorneys opted for the form of restraint that they thought would minimize prejudice—the "effect on the jurors." But the court had just held that its decision was instead "motivated primarily by the potential effect a stun belt may have upon the person wearing the device," not the "effect on the jurors." Thus, "[o]bviously, they were later proven wrong" to have evaluated the choice of restraint through the lens of juror-prejudice alone. Nonetheless, because the attorneys could not be faulted for failing to predict the form of

prejudice announced in *Wrinkles II*, "at the time the decision was made, it was a prudent one."

Placing *Wrinkles II* within the larger context of Indiana law—both procedural law and a subsequent interpretation laid out by the Indiana Supreme Court—reinforces this reading. When reviewing a state-court decision in federal courts, the resolution of potentially dispositive ambiguities occasioned by a state-court finding should be resolved, where possible, by reference to that state's law. *See Tibbs v. Florida*, 457 U.S. 31 (1982) (direct review); *Greene v. Massey*, 437 U.S. 19 (1978) (collateral review); *Rivera v. Sheriff of Cook County*, 162 F.3d 486, 489 (7th Cir. 1998) (collateral review post-AEDPA). Thus, in an analogous situation, the Supreme Court has instructed lower courts to examine the state's procedural law closely, or to certify questions to the state's highest court when necessary, *Greene*, 437 U.S. at 26 n.8, 27, or to examine subsequent decisions that may shed some light on the issue at hand, *Tibbs*, 457 U.S. at 46-47.

Here, Indiana procedural law and a subsequent supreme court decision support the conclusion that the above reading of *Wrinkles II* is the proper one. First, as discussed above, it is implausible to view the "Obviously" statement as an implicit factual finding by the the supreme court. Under Indiana law, the supreme court would not have examined additional affidavits contained in a motion to correct error. And the rest of *Wrinkles II* is more consistent with a blanket affirmance than with an affirmance despite a factual finding contrary to the post-conviction court's. This latter scenario is especially unlikely given that the supreme court was reviewing only for clear error.

But more importantly, this court must credit the Indiana Supreme Court's later interpretation of *Wrinkles II* in resolving the ambiguity contained in the disputed passage.

*Tibbs*, 457 U.S. at 46-47 ("Any ambiguity in *Tibbs I* . . . was resolved by the Florida Supreme Court in *Tibbs II*," which "binds this Court."). Although it is not often that an ensuing state supreme court decision affects a disputed finding in a previous decision, it is not unprecedented. This scenario arises with some regularity when reviewing whether a defendant's retrial following a state appellate court's reversal of a conviction raises double jeopardy concerns. And defendants frequently raise these claims before federal courts on collateral review. *See, e.g.*, *Rivera*, 162 F.3d at 489. If the state appellate court reversed because the evidence in the first trial was insufficient, double jeopardy attached and retrial is improper. But if the appellate court reversed simply because the defendant's first conviction was against the "weight of the evidence," the defendant's retrial is constitutional. In deciding which basis the state appellate court relied on in reversing, federal courts must often parse the appellate court's decision against the backdrop of the state's procedural law and ensuing case law. *Id.* ("[S]tate courts should themselves determine the right way to understand their pronouncements.").

A scenario comparable to the case at hand presented itself to the Supreme Court in *Tibbs v. Florida*, 457 U.S. at 31. There, the Florida Supreme Court's first decision reversing Tibbs's conviction did not obviously rest on either the "insufficiency" or the "weight of the evidence." But a second Florida Supreme Court opinion following Tibbs's retrial clarified matters; the earlier reversal had been based on the "weight of the evidence." One issue before the Supreme Court on appeal from this latter decision was whether the initial reversal had been based instead on the "weight of the evidence." The Supreme Court

affirmed the defendant's conviction following retrial, noting that the Florida Supreme Court's "construction of its prior opinion binds this Court." *Id*. at 46-47. Because "[a]ny ambiguity in *Tibbs I* . . . was resolved by the Florida Supreme Court in *Tibbs II*," *id.*, the Court had to give effect to the decision—meaning that the defendant's retrial had been proper.

In *Stephenson v. Indiana*, 864 N.E.2d 1022 (Ind. 2007), the Indiana Supreme Court provided similar guidance. In *Stephenson*, the court compared the decision made by Wrinkles's counsel in choosing the stun belt with the same decision made by Stephenson's during his trial. In so doing, the court explained its rationale in *Wrinkles II*:

> At the time of Stephenson's trial in 1996 and 1997, no Indiana ruling had addressed the use of stun belts. As in *Wrinkles*, counsel cannot be faulted for selecting the belt over more visible shackles, given that the case law addressing the issue had largely focused on the visibility of the restraint, and not, as Wrinkles later pointed out, on the belt's potential effect on the defendant's demeanor and ability to participate in the defense.

*Id.* at 1032. The court went on to characterize the decision made by Wrinkles's attorneys as a "tactical decision." The "only real issue" in Wrinkles's trial was sentencing, so "[t]he decision to challenge the belt [there] arguably fell into the tactical range, balancing the likelihood of success against the risk of alienating the judge by challenging an announced 'policy.' " *Id*. Because in Stephenson's case, guilt was "vigorously disputed," a "tactical" classification could not apply. The court went on to hold that the "use of a stun belt, if perceived by the jury, produces all the results that shackling does." After a careful examination of the post-conviction record, the *Stephenson* court concluded

that the jurors had been aware of the stun belt. Nonetheless, the court upheld Stephenson's convictions and death sentence because he had not demonstrated the requisite amount of "prejudice" to establish his ineffective-assistance claim.

This discussion of *Wrinkles II* in *Stephenson* indicates that the above reading is the appropriate one. The section discussing the *Wrinkles II* decision tracks the Indiana Supreme Court's reasoning in the exact manner discussed above. The court recreated the decision facing Wrinkles's attorneys in light of the established form of prejudice at the time. The court again recognized that Wrinkles's attorneys viewed their decision at trial in light of the "visibility of the restraint," and not the "belt's potential effect on the defendant's demeanor and ability to participate in the defense." And just as it had in *Wrinkles II*, the court concluded that Wrinkles's counsel could not be faulted for failing to predict the prejudice the court would credit in banning the stun belt.

Even with the benefit of this reading, the Indiana Supreme Court unreasonably applied *Strickland* in evaluating Wrinkles's attorneys' performance in *Wrinkles II*. The failure to object itself fell below what is expected under professional norms, regardless of the theory of prejudice. A blanket policy of restraint cannot be squared with the case law at the time of trial. But notwithstanding the propriety of the court's conclusion, it is evident that the court did not make a finding that the jurors had seen the stun belt. Instead, the court in *Wrinkles II* was reconstructing the decision made by Wrinkles's counsel based on the then-established form of prejudice associated with the stun belt.

In light of the nature of the court's reasoning in *Wrinkles II*, the discussion in *Stephenson*, and the implausibility

under Indiana law of the Indiana Supreme Court making implicit factual findings, we conclude that the Indiana Supreme Court did not make a finding of fact that the jurors had seen the stun belt. The controlling findings of facts are those set forth by the state post-conviction court and adopted by the *Wrinkles II* court. These findings of fact determined that the jury did not see the stun belt. Additionally, Wrinkles has not presented us with any evidence to demonstrate that the stun belt affected his abilities to properly participate in his own defense. Without evidence that the jurors saw the stun belt, or that he was otherwise affected by the stun belt throughout trial, Wrinkles cannot demonstrate prejudice. *See Strickland*, 466 U.S. at 694. He therefore cannot show that he received ineffective assistance of counsel, so he cannot demonstrate the requisite cause and prejudice necessary to overcome his procedural default. *Guest*, 474 F.3d at 930. Thus, this Court is procedurally barred from examining his freestanding stun-belt claim and must deny the writ.

## III. CONCLUSION

The decision of the district court is AFFIRMED.

ROVNER, *Circuit Judge*, dissenting.   I agree with my colleagues that Matthew Wrinkles's trial attorneys were deficient in failing to object to the trial court's insistence on the use of restraints absent judicial findings

that Wrinkles presented a security threat or otherwise required physical restraints. I cannot agree, however, that Wrinkles was not prejudiced by counsels' error. The natural reading of the opinion of the Indiana Supreme Court in *Wrinkles II* is that several jurors were aware of the stun belt during the trial. In light of that finding, Wrinkles has shown both the inherent prejudice that accompanies visible restraints and other detriments specific to his case. Only through a tortured interpretation of the Indiana Supreme Court's opinion, with which not even the respondent agrees, does the majority conclude that Wrinkles was not prejudiced by his attorneys' error. I would not wager a man's life on the correctness of the majority's grammatical parsing, and therefore I respectfully dissent.

During the state postconviction proceedings, Wrinkles submitted affidavits from two jurors who attested that, during the trial, they were "aware" that Wrinkles was wearing a shock belt. One juror "believe[d]" that a bailiff told the jurors of the belt and the other was unsure how he became aware but "believe[d]" the judge told the jurors. A third juror (juror Kraft) attested that she was aware of the belt and even saw it on Wrinkles during the trial; she described the belt as looking like a cummerbund. Kraft also stated that she may have become aware of the belt after the trial from a newspaper article. Despite ample time to investigate and prepare counter-affidavits, the state submitted only one, from one of the three bailiffs who worked at Wrinkles's trial. The bailiff attested that he never communicated to the jurors that Wrinkles was wearing a stun belt. Nothing, however, contradicted the three jurors' testimony that they knew about the belt; only *how* each learned of it remained open

to question. Despite the testimony by all three jurors that they knew about the stun belt, and with nothing in the record to the contrary, the postconviction court found that the jurors were not aware of the stun belt. The court reasoned that the affidavits were not credible because of inconsistencies and because the jurors were not subject to cross-examination.[1]

Wrinkles vigorously contested the court's finding. He moved the postconviction court to reopen the evidence and to correct error, and supplemented the record with four additional juror affidavits. Kraft, one of the three original affiants, clarified that she had "no doubt" that during the trial she knew the belt she saw on Wrinkles was a stun belt, although she was still unsure as to how she came by that knowledge. Three additional jurors attested that they were aware of the belt during the trial, although none could recall the source of that information. Two of them supplied the additional detail that they understood that the belt could be activated remotely by a deputy. Finally, in a supplemental filing, one additional juror attested that she saw the stun belt during the trial. The postconviction court declined to revisit the issue and denied Wrinkles's motions.

Wrinkles argued on appeal to the Indiana Supreme Court that the finding that the jurors were unaware of the stun belt was erroneous. In its opinion, the Indiana Supreme Court implicitly accepted that argument by making statements inconsistent with the postconviction court's

---

[1] The court also did not explain why it credited the bailiff's affidavit, which was also not subject to cross-examination. The affidavits are duly sworn under the penalty of perjury. They were prepared four years after the trial.

finding. If the jurors knew about the stun belt, we must presume that Wrinkles was prejudiced, and so the interpretation of the supreme court's statements on this subject is the linchpin of this case.

In its first reference to the issue, the Indiana Supreme Court stated: "Wrinkles asserts that utilization of the stun belt, which was conspicuous to at least seven jurors, undermined his presumption of innocence and made him appear dangerous and uncontrollable in front of the jurors who would help decide whether he would live or die*." Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001) (*Wrinkles II*). The statement is ambiguous at best, and it could be interpreted as the court's recapitulation of one of Wrinkles's arguments. However, Wrinkles's proffered interpretation, that the supreme court itself believed that the stun belt was conspicuous, is also plausible because the court did not specifically ascribe that assertion to Wrinkles.[2] The sentence reads more naturally as an acknowledgment by the court that seven jurors were aware of the belt.

The court's second mention of the critical factual issue is not ambiguous. It first states that Wrinkles's counsel, lacking the guidance of the later decision to ban stun belts outright, reasonably chose between shackles and stun belt based on the effect each might have on the jurors. *Id.* at 1195. The court continues: "Counsel believed that the chance of the jury seeing the shackles was fairly high. On the other hand, counsel opted for the stun belt because

---

[2] As the majority points out, *ante* at 20 n.3, the supreme court otherwise consistently used such language as "Wrinkles contends" or "He claims" immediately preceding his arguments.

they thought that jurors would not be able to see it. *Obviously, they were later proven wrong*. However, at the time the decision was made, it was a prudent one." *Id*. (emphasis added). Given the preceding sentence, the italicized sentence must be read as an acknowledgment by the supreme court that, despite counsels' pretrial predictions that the stun belt would go undetected, some jurors indeed were aware of it.

The majority, however, concludes that the attorneys were "later proven wrong" in their decision to evaluate "the choice of restraint through the lens of juror-prejudice alone." *Ante* at 30. In order to arrive at this tortured result, my colleagues devote no less than ten pages to what they describe, fittingly, as "Our Reading of 'Obviously, they were later proven wrong.'" *Ante* at 26. The subheading is particularly apt because it is the majority's interpretation and the majority alone. At oral argument, even the State of Indiana did not deny that the statement means that the supreme court believed that jurors were aware of the belt. *Cf. McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002) ("The verbal admission by SCI's counsel at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings."). Instead, the State characterized this finding as "an aside" the supreme court inserted while making the point that "the fact that later the jurors may have seen it . . . doesn't matter for counsel's decision at the time he made it." Indeed, nowhere in its brief does the State mention the passage of the Indiana Supreme Court's opinion that divides the panel, a fact which makes the majority's ten-page analysis of the disputed passage all the more extraordinary. *See*, *e.g.*, *Kochert v. Adagen Med. Int'l., Inc.*, 491 F.3d 674, 679 (7th

Cir. 2007) (Plaintiff "did not raise, much less develop this argument, and undeveloped arguments are waived.").

Then my colleagues, who accuse Wrinkles of taking the statement out of context, proceed to rearrange the entire paragraph to reach the conclusion that the Indiana Supreme Court was explaining why "counsel's decision to choose the stun belt was a 'prudent one' even though the attorney's were 'later proven wrong' to examine their choice solely based on 'the effect of the jurors.'" *Ante* at 27. Not only does this interpretation strain common sense, it is inconsistent with the supreme court's analysis of counsels' decision. As the majority concedes, the Indiana Supreme Court erroneously concluded that counsel were not deficient for failing to object to the stun belt because in light of the trial court's supposed policy of requiring restraints, "an objection to wearing restraints would not have been sustained by the trial judge even if made." *Wrinkles II*, 749 N.E.2d at 1195. Thus, the Indiana Supreme Court excused counsels' failure to know the law with the illogical reasoning that the trial judge's illegal policy obviated the need for an objection.

Given this view, it would make no sense for the Indiana Supreme Court to in the same breath conclude that counsel were "later proven wrong" to have evaluated the situation solely through the lens of Wrinkles's appearance before the jury. Quoting a piece of the disputed sentence and then adding on its own "clarification" the majority comes up with the following conclusion: "Thus, '[o]bviously, they were later proven wrong' to have evaluated the choice of restraint through the lens of juror-prejudice alone. Nonetheless, because the attorneys could not be faulted for failing to predict the form of prejudice announced in *Wrinkles II*, 'at the time the decision

was made, it was a prudent one.'" *Ante* at 30. But being "proven wrong" about the possibility that the defendant would be prejudiced by the jury seeing him restrained is a nearly nonsensical concept. After all, the fact that the Indiana Supreme Court emphasized the effect of the restraint on the defendant (a form of prejudice long-recognized, not, as both the Indiana Supreme Court and my colleagues seem to believe, a novel proposition) as opposed to the prejudice occasioned by the jury seeing the belt does not mean that prejudice from a visible restraint is no longer a legitimate concern of counsel—i.e., that counsel would be "wrong," as the majority suggests, for considering that form of prejudice. That borders on the absurd.

The majority claims its strained interpretation is the more plausible one in light of first, Indiana procedural law, and second, the Indiana Supreme Court's subsequent decision in *Stephenson*. As for state procedural law, it seems odd indeed to be assessing whether the Indiana Supreme Court breached its own procedural rules in the context of a federal habeas claim, *see*, *e.g.*, *McCloud v. Deppisch*, 409 F.3d 869, 875-76 (7th Cir. 2005) (construction of state law irrelevant in habeas proceeding), where it goes without saying that state law cannot be the basis for relief. Conversely, if our decision turns on the answer to a question of state law, something is amiss. On the issue of the additional affidavits Wrinkles sought to have admitted in the postconviction court, the state conceded at oral argument that the Indiana Supreme Court reviewed those affidavits "in some fashion." It seems both unusual and unhelpful to analyze whether we believe the Indiana Supreme Court is allowed under Indiana law to do precisely what the state concedes that it did. More-

over, I do not think the additional affidavits are determinative—the Indiana Supreme Court could easily have rejected the postconviction court's conclusion based on the three affidavits indisputably in the record, making the majority's preoccupation with whether the supreme court had the authority under state law to review the additional affidavits largely irrelevant.

The majority's unlikely interpretation also ignores the procedural context. First, the factual issue was squarely presented to the Indiana Supreme Court. Second, the Court suggests that it reviewed all seven juror affidavits despite the postconviction court's refusal to do so; it referred to the belt being conspicuous to "at least seven" jurors. *See Wrinkles II*, 749 N.E.2d at 1192. Third, because no jurors testified at the postconviction hearing, the supreme court was at no disadvantage compared to the trial court in evaluating the credibility of the jurors' statements, and so there is no reason to defer to the trial court's interpretation. Finally, the supreme court made statements inconsistent with the factual finding of the postconviction court. The only logical conclusion is that the Indiana Supreme Court supplemented the record with its own finding that a number of jurors were aware that Wrinkles was restrained by a stun belt.

The majority protests that such a conclusion cannot be drawn because, "[h]ere, Wrinkles *did not appeal* the post-conviction court's refusal to admit the additional affidavits into evidence," *ante* at 24 (emphasis in original). Not only is this line of argument a red herring, it is simply untrue. In fact, Wrinkles *did* appeal the post-conviction court's refusal to admit the additional affidavits. Specifically, Wrinkles's brief on appeal to the Indiana Supreme Court states that "Wrinkles attempted to admit

affidavits from four additional jurors who knew Wrinkles was restrained. The post-conviction court erroneously denied Wrinkles' motion to supplement the record with these affidavits." (Brief for Petitioner-Appellant at 19 n.6, *Wrinkles v. Indiana*, No. 82C01-9407-CF-447.) The fact that, contrary to the majority's repeated insistence otherwise, *see ante* at 24, Wrinkles placed the issue before the Indiana Supreme Court makes the court's reference to the jurors' awareness of the belt all the more straightforward.

Moreover, whether the Indiana Supreme Court did or did not formally admit the additional affidavits is in no way as determinative as my colleagues suggest. The three affidavits that were originally admitted all establish the jurors' knowledge of the stun belt; and Wrinkles vigorously argued to the supreme court in a properly preserved appeal that the postconviction court's contrary finding was clearly erroneous. Those three affidavits alone established the jurors' knowledge; it is only the source of that knowledge that was unclear. Neither the testimony of Wrinkles's attorneys (regarding the belt's *visibility*) nor the affidavit from *one of the* bailiffs[3] (regarding

---

[3] Notably, although the majority emphasizes the bailiff's affidavit, his sworn testimony that he was "sequestered with the jury for the entire duration of the trial" was later shown to be inaccurate. That bailiff eventually submitted a supplemental affidavit clarifying that he was temporarily absent from the trial and another bailiff took over his duties during that time. Nor was this bailiff the only one assigned to the trial; thus there is little to the postconviction court's suggestion that the bailiff's affidavit contradicted Kenneth Ranes's affidavit that he believed "the bailiff" told jurors about the stun belt.

his own communication with jurors and not ad-
dressing any other possible source) contradicts the
jurors' testimony that they *knew about* the belt. And the
state did not produce a single counteraffidavit from a
juror who was *not* aware of the belt. As I have stated, to
the extent there was no oral testimony by the jurors, and
the issue was decided on the basis of the affidavits alone,
there is no reason to defer to the postconviction court's
interpretation of the written testimony over the Indiana
Supreme Court's.

The Indiana Supreme Court's discussion of *Wrinkles II*
in *Stephenson* likewise does nothing to undercut the
plain language of the disputed passage. In a confusing
passage devoted to "explaining" why "obviously, they
were later proven wrong" means wrong about some
other issue than the one identified in the preceding sen-
tence, the majority resorts to yet another Indiana Su-
preme Court case on stun belts. But it is unclear how
*Stephenson*, which does indeed discuss *Wrinkles II*, sheds
any light on whether the court believed the jurors knew
about the stun belt in Wrinkles's case. The majority first
explains its reliance on *Stephenson* by analogizing it to a
situation where "an ensuing state supreme court decision
affects a disputed finding in a previous decision." *Ante* at
32. But the examples cited provide no precedent for
resorting to a later opinion to clarify a state court's find-
ing of fact in an earlier, unrelated proceeding. The sup-
posedly "comparable" case relied on by the majority—
*Tibbs*—demonstrates the point. There the United States
Supreme Court referred to a later pronouncement by
the Florida Supreme Court to resolve ambiguity in the
earlier opinion *in the same case*; to be sure, subsequent
pronouncements in the same case may illuminate the

basis of a state court decision—as in *Tibbs* when a case is reversed and then retried and the court in the second appeal comments on its rationale in the first appeal. But using an *unrelated* subsequent state court opinion to interpret the meaning of case-specific language in a previous case strikes me as, if not unprecedented (certainly the majority points to no truly analogous scenario), highly unusual.

At all events, *Stephenson* is hardly so illuminating as the majority suggests. My colleagues point out that *Stephenson* "tracks" the reasoning from *Wrinkles II* by recreating the decision facing Wrinkles's counsel at the time and their concern with whether the jury would see the belt as opposed to what effect the device would have on Wrinkles. But the fact that the Indiana Supreme Court repeated in *Stephenson* its mistake in *Wrinkles*—excusing counsels' objectively deficient performance—sheds no light on the meaning of "obviously, they were later proven wrong." Notably, the court in *Stephenson* concluded that the jurors in that case *did see* the defendant's stun belt. But despite the discussion that "tracks" its reasoning in *Wrinkles II*, the court nowhere distinguishes *Wrinkles II* on the basis that the jurors in that case did not know about the stun belt. *Stephenson's* explicit finding that the jurors in that case were aware of the stun belt still did not lead the court to conclude that counsel were deficient. *See Stephenson*, 864 N.E.2d at 1034-40. If anything, the supreme court's repetition in *Stephenson* of its mistake regarding counsels' effectiveness confirms that the court failed, in both *Wrinkles II* and *Stephenson*, to see that failure to object to restraints imposed without particularized justification amounts to objectively deficient representation. The court's inability to appreciate this in *Stephenson* makes it

all the more obvious that it recognized in *Wrinkles II* that the jurors were aware of the belt, but erroneously deemed that fact irrelevant in light of its misplaced focus on the fact that the trial court would have (incorrectly) overruled an objection to the stun belt. *Compare Wrinkles II*, 749 N.E.2d at 1195 *and Stephenson*, 864 N.E.2d at 1040-41.

Finally, the majority places great weight on the fact that the Indiana Supreme Court was considering the "choice of restraint facing Wrinkles's attorneys at trial in light of the only theory of prejudice then available—the 'effect on the jurors.' " *Ante* at 27. But neither the majority nor the Indiana Supreme Court is correct that the jury's diminished impartiality was the only legally recognized form of prejudice at the time of Wrinkles's trial. Both the United States Supreme Court and lower courts have long recognized that the harm flowing from visible restraints is threefold. In addition to the potential effect on the jury's impartiality, the Supreme Court in 1970 recognized that restraints may interfere with the accused's right to assist in his defense. *See Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("[O]ne of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint."). In *Deck v. Mo.*, 544 U.S. 622, 631 (2005), the Supreme Court refers to the " 'ancient' English rule" forbidding shackles and bonds absent a compelling justification—a rule formed in part out of concern that the restraints not interfere with a defendant's presentation of his defense: " 'If felons come in judgment to answer, . . . they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will.' " *See Deck*, 544 U.S. at 626 (quoting 3

E. Coke, *Institutes of the Law of England*). Lastly, *Allen* points out that the use of visible restraints is an affront to the dignity of judicial proceedings. *Allen*, 397 U.S. at 344. Thus, at least from *Allen* onward, courts have recognized three distinct harms flowing from the use of visible restraints: (1) prejudice to the jury's impartiality, (2) prejudice to the defendant's ability to participate in his defense, and (3) damage to the dignity of the proceedings. *See, e.g.*, *Deck*, 544 U.S. at 630-32 (recognizing "three *fundamental legal principles*" animating the "judicial hostility" towards visible restraints) (emphasis added); *Harrell v. Israel*, 672 F.2d 632, 635 & n.3 (7th Cir. 1982) (citing *Allen* to support three reasons given for the rule against physical restraints); *Coates v. State*, 487 N.E.2d 167, 169 (Ind. App. 1985) (recognizing that restraints distract defendant's "thought process"); *People v. Brown*, 358 N.E.2d 1362, 1363 (Ill. App. 1977) (recognizing the prejudicial effect of restraints on jury's feelings about defendant, the possibility that shackles would impair defendant's ability to communicate with counsel, and the fact that shackles detract from "dignity and decorum of judicial process").

Thus, there is no basis for the majority's attempt to explain away the clear import of the phrase "[o]bviously, they were later proven wrong" by reasoning that the Indiana Supreme Court must have been excusing counsels' failure to predict that the effect on a defendant would one day become a legal rationale forbidding the use of restraints at trial. That rationale *was* available to counsel at the time of Wrinkles's trial. And the fact that counsel failed to "predict" what was in fact a long-settled rule of law is not remotely surprising: lead trial counsel testified at the postconviction hearing that, "I did not know that there was a law about shackling." If anything, the

Indiana Supreme Court's failure to acknowledge the longstanding recognition that restraints also prejudice the accused's ability to participate in his defense simply reaffirms that the Indiana Supreme Court unreasonably applied clearly established law. *Cf. Williams v. Taylor*, 529 U.S. 362, 407 (2000) (state court unreasonably applies Supreme Court precedent when it "unreasonably refuses to extend" a legal principle "to a new context where it should apply"). As this court recently recognized, "law" refers not just to Supreme Court holdings, but "legal principles derived from the holdings in Supreme Court opinions." *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008). Thus, the fact that earlier law may not have addressed stun belts in particular as opposed to restraints generally is of no consequence.

It is well established that our obligation to defer to the factual findings of state courts extends to appellate courts. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Miranda v. Leibach*, 344 F.3d 984, 999 (7th Cir. 2005); *Mendiola v. Schomig*, 224 F.3d 589, 592-93 (7th Cir. 2000); *Sprosty v. Buchler*, 79 F.3d 635, 643 (7th Cir. 1996); *Holland v. McGinnis*, 963 F.2d 1044, 1048 (7th Cir. 1992). The finding that some jurors knew about the stun belt is amply supported by the record, and we must defer to it. *See Sprosty*, 79 F.3d at 643 (presumption of correctness applies to "implicit resolution of a factual dispute that can be fairly inferred from the state court record"). In contrast, the majority, like the state postconviction court, can point to no record evidence supporting the conclusion that the jurors were not aware of the belt. Instead, it shores up its unlikely interpretation with a foray into state law positing that under Indiana law, the Indiana Supreme Court probably would not do what common sense suggests

that it did when it commented that Wrinkles's attorneys did not think jurors would see the stun belt but "they were later proven wrong."

Of course, even finding that some jurors were aware of the stun belt did not lead the Indiana Supreme Court to conclude that Wrinkles's attorneys were deficient for failing to object. That conclusion, rightly rejected by my colleagues, is largely based on the Court's determination that any objection would have been futile due to the trial court's practice of routinely requiring restraints, as well as the fact that Wrinkles's guilt was not in question. I will not dwell on the erroneousness of that analysis, but it is worth emphasizing that counsel's obligation to object for the record was *more*, not less, urgent where the judge imposed an extralegal burden on Wrinkles without even attempting to justify it. Moreover, counsels' failure to object—whatever the probable ruling—contributed in large part to the procedural hurdles Wrinkles now must clear in order to get relief, compounding their error. The majority appropriately concludes, therefore, that Wrinkles's counsel were deficient for failing to object to the use of restraints without justification.

After parting ways with the Indiana Supreme Court on the first prong of *Strickland*, however, the majority then relies on its strange interpretation of that Court's factual finding to conclude that Wrinkles was not prejudiced by his attorneys' failure to object. "Without evidence that the jurors saw the stun belt, or that he was otherwise affected by the stun belt throughout trial, Wrinkles

cannot demonstrate prejudice."[4] *Ante* at 35. Constrained by the Indiana Supreme Court's finding that a number of jurors knew about the stun belt as well as the record evidence that the stun belt did indeed affect Wrinkles throughout trial, I would reach a different result.

It has long been established that visible restraints are so prejudicial that they are permissible only where a "special need" is present. *Deck*, 544 U.S. at 626; *see Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Allen*, 397 U.S. at 344. Routine use of restraints is prohibited; their employment must be preceded by a judicial finding that an essential state interest such as physical security, escape prevention, or courtroom decorum requires the use of restraints on a particular defendant. *See Deck*, 544 U.S. at 628. So "inherently prejudicial" are visible restraints, *Holbrook*, 475 U.S. at 568, that no "actual prejudice" need be demonstrated by a defendant asserting a deprivation of due process based on their unjustified use, *Deck*, 544 U.S. at 635.

Wrinkles's situation cannot be distinguished from the line of cases addressing visible restraints because the stun belt was "visible" in the only meaningful sense to any juror who was *aware* that he was restrained. *See Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002). In this sense, the majority has seized upon yet another red herring, repeatedly referencing Wrinkles's inability to establish

---

[4] I have already commented that the majority's interpretation of the Indiana Supreme Court's statements on this matter strains credulity. But, in the face of the juror affidavits admitted into the record, the majority's statement that Wrinkles is "without evidence" that jurors knew about (the more appropriate term than "saw") the stun belt is wholly inaccurate.

that the belt was "visible" or "seen." *See, e.g., ante* at 2, 9, 11, 13-14 n.3, 20-22, 28. But of course the prejudice caused by restraints stems from the jurors' *knowledge* of them, not their "visibility," and the false distinction the majority weaves throughout its opinion is an unfortunate distraction.

Given the jurors' *awareness* of the belt, every type of prejudice that the Supreme Court has associated with the use of restraints is implicated in this case. First, the message sent by restraints—that the judicial system itself already believes the defendant to be uncontrollably dangerous—undermines the presumption of innocence. *Deck*, 544 U.S. at 630. Although Wrinkles admitted to killing the victims, the jury had to decide what level of homicide he had committed, and the burden was on the state to prove that he committed knowing murder. The jury's decision on the level of homicide, as much as any other determination of guilt, could be tainted by their knowledge of the stun belt.

Second, physical restraints can interfere with the defendant's ability to participate in his own defense. *Id*. at 631. The most obvious example of that in this case is when Wrinkles's attorney warned him not to "make any sudden moves" in response to Wrinkles asking where he should put his hands while testifying. This exchange came on the heels of an incident midway through trial when the belt began "buzzing." The trial had to be halted as a result and the same belt was put back on Wrinkles after investigation revealed that the buzzing was caused by a low battery. No doubt this incident and the constant fear of an unannounced, unstoppable 50,000-volt shock impaired Wrinkles's ability to participate in his defense. Not surprisingly, Wrinkles's attorney described his

client as "petrified" by the vibrations that accompanied the "buzzing" belt. Third, the dignity of judicial proceedings suffers when a participant is in restraints. *Id.* at 631-32. That the trial had to be halted due to the belt's "buzzing" provides a stark example of this last concern.

The prejudice inflicted by restraints is particularly dangerous in a case such as this, where any one factor could have been decisive for the jury in both the guilt and penalty phases given the nature and strength of Wrinkles's defense. As appellate counsel explained, the use of the belt negated the entire theory of the defense: that Wrinkles was not a dangerous or violent person by nature but had "snapped" under extreme circumstances such as the bitter separation from his family, a recent involuntary commitment to a psychiatric facility, and a severe drug addiction. Indeed, sufficient evidence was adduced at trial to instruct the jury on voluntary manslaughter (which entails "sudden heat") and reckless homicide in addition to knowing murder. Surely a presumption that Wrinkles was so dangerous as to require restraints would make a conviction for knowing murder more likely than it might have been based on the evidence alone. *See Harrell*, 672 F.2d at 637 (visible restraints "could instill in the jury a belief that the defendant is a dangerous individual who cannot be controlled, an idea that could be devastating to his defense.") The prejudice was renewed during the sentencing phase, when the jurors who were aware of the stun belt had to decide whether to recommend death or imprisonment while believing Wrinkles was still violent and dangerous. Particularly where the mitigating factors far outnumbered the one aggravating factor allowing for the death penalty, *see Roche*, 291 F.3d at 484, the potential influence

of the stun belt cannot be overstated. Accordingly, I must conclude that Wrinkles was prejudiced by the failure of his attorneys to object to the use of a stun belt.

Finally, even if I could accept my colleagues' strained characterization of the Indiana Supreme Court's statements on the visibility of the stun belt, I would find it difficult to accept their reflexive conclusion that Wrinkles was not prejudiced. The jurors' awareness of the restraint aside, Wrinkles also argues that he could not fully and meaningfully participate in his trial while strapped to a torture device. This argument was a logical application of existing Supreme Court precedent on restraints, and competent counsel would surely have raised it in response to the trial court's illegal "policy." The majority dismissively concludes that Wrinkles did not present "evidence" that the stun belt "affected his abilities to participate in his own defense," *ante* at 35. Not only did he present such evidence (see discussion *ante* at 51-52), in my view a court need not abandon its common sense when considering whether being forced to wear, with no justification, a device that delivers an unstoppable, 8-second, 50,000-volt shock might affect a defendant's participation and demeanor, and, relatedly, the jury's impressions of him. For this reason, and more importantly because of the prejudice stemming from the jurors' awareness that Wrinkles was restrained with a stun belt, I respectfully dissent.

8-12-08